Filed 10/2/14  P. v. Cismas CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ALEXANDER TUDOR CISMAS,<br><br>  Defendant and Appellant. | B247706<br><br>(Los Angeles County<br>Super. Ct. No. SA080236) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elden S. Fox, Judge.  Affirmed.

Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Tita Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

## SUMMARY

Alexander Cismas challenges his convictions for grand theft and identity theft. He maintains the prosecutor engaged in misconduct, the trial court adopted an adversarial role during trial, and that cumulative error requires reversal. We reject these contentions, and affirm.

## PROCEDURAL BACKGROUND

By amended information, appellant Alexander Cismas was charged with two counts of grand theft of personal property (Pen. Code,[1] § 487, subd. (a); counts 1 & 4), one count of grand theft with a loss exceeding $950 (§ 484g, subd. (a); count 2), and one count of identity theft (§ 530.5, subd. (a); count 3).

Appellant pleaded not guilty and denied the special allegations. Trial was by jury, and appellant was convicted as to all four counts.

Imposition of sentence was suspended as to all counts. Appellant was placed under formal probation under certain terms and conditions, including that he serve 365 days in county jail, with precustody credit for 96 days. The court assessed various fees and fines against appellant and ordered him to pay restitution.

## FACTUAL BACKGROUND

*Prosecution case*

*Count 1: Grand theft of personal property of Romy Daniels*

In April 2011, Romy Daniels hired appellant to help her run errands and to babysit her children. In that capacity, Daniels gave appellant keys to her home, to which he had access when Daniels was not home. Daniels also gave appellant cash in advance to run her errands. Daniels never gave appellant a credit card or access to or permission to use her credit cards, and never gave him permission to take any of her belongings.

On February 7, 2012, Daniels received a phone call from a credit card company questioning charges on a credit card she kept hidden in a satchel in a hall closet. The

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

satchel contained jewelry, financial documents, family passports and a number of credit cards. After confirming that the charges were unauthorized, Daniels discovered her satchel was missing.

Daniels filed a police report. Detective Gregory Taylor showed Daniels a video connected to the unauthorized credit card charges, in which Daniels identified appellant. Detective Taylor sent Daniels to two pawnshops near her home. At the Salter Pawnshop, Daniels located multiple items of gold, silver, diamond and precious gem jewelry which she had received as gifts from her parents. At Pacific Pawnbrokers, Daniels found a silver goblet, more precious jewelry and a watch, all of which she had also received from her parents.

The owner of Salter's Pawnshop testified that he had made numerous purchases from appellant, specifically, a gold chain with diamond, opals, and sapphires, a gold bangle, gold pendant and gold bracelet, all of which Daniels identified as hers. An employee of Pacific Pawnbrokers verified having purchased from appellant on various occasions items identified at trial by Daniels as her property. Each pawnbroker had identified appellant by his driver's license when the items were pawned, and identified him at trial as the person who sold them.

*Counts 2 and 3: Grand theft of personal property of Margit Brandhuber*

In September or October 2011, Margit Brandhuber met Yvette Brandeis through family friends. Brandhuber rented her West Hollywood apartment to Brandeis while Brandhuber was out of state for several months. Brandhuber later allowed appellant, whom Brandeis identified as her boyfriend, to also move in.

In mid-December 2011, while still out of state, Brandhuber's credit card company called Brandhuber and asked whether she had made $11,000 in charges. She had not. Brandhuber subsequently learned about $3,500 in additional unauthorized charges on her PayPal credit card account.

Brandhuber returned to West Hollywood in mid-January 2012, but was afraid to go back to her apartment because appellant was living there. She was unable to gain full access to the apartment until March 10, 2012. Afterwards, Brandhuber noticed that a

3

number of items of her personal property were missing. She also found credit and identification cards which she did not recognize and gave to Detective Taylor. Among the items Brandhuber found was paperwork for a PayPal account and two associated credit cards, one in her name and one in appellant's. Brandhuber never authorized appellant to use her credit cards, never opened a credit card account with appellant and never authorized him to take out a credit card in her name. After learning about the unauthorized charges, Brandhuber spoke to appellant twice on the phone while Brandhuber was still out of state. Appellant took responsibility for the unauthorized charges, and promised to take care of everything.

Carla Wenzler, a fraud investigator and custodian of records for the bank that underwrites PayPal credit cards testified that appellant had been added as an authorized user to Brandhuber's PayPal account pursuant to a telephonic request on November 9, 2011. A manager for a Best Buy store testified that business records indicated appellant had picked up $1,034.20 worth of electronic products from the store. The items were paid for with Brandhuber's PayPal credit card.

*Count 4: Grand theft of Nordstrom property*

On the evening of March 10, 2012, Gerardo Benavides, a Nordstrom Loss Prevention agent, was told by a salesperson that appellant had tried to put a watch in his pocket without paying for it. Benavides watched appellant try to open several watch display cases. Appellant grabbed a handful of watches from one of the cases and put them in a plastic bag he was carrying. Appellant subsequently opened two more drawers, and pulled out more watches which he placed in his plastic bag before leaving the store. Benavides stopped appellant, and asked him to come to his office, where Benavides recovered from appellant's bag approximately nine watches and a watch wristband, with a combined value of $3,510. Appellant never tried to pay for the watches or wristband.

*Defense case*

Al Tudor Dupont, appellant's uncle and godfather, loves appellant. Dupont has had a close relationship with appellant since appellant's birth, and was his caretaker in Romania beginning in 1981 after appellant's mother moved to the United States. Daniels

is Dupont's neighbor; he has known her for six or seven years. About 12 to 18 months before trial, Dupont saw appellant driving with Daniels and her children on Santa Monica Boulevard, near the Fairfax area. He saw appellant park the car, and watched everyone get out. When Dupont later asked appellant what he had been doing, appellant told him he had gone "with [Daniels] and the kids to do some business at the pawnshop." On one occasion, Dupont overheard Daniels crying to Dupont's sister, and complaining that her husband did not pay adequate attention to her. Daniels was upset that she "was trading" because her husband did not give her enough money. Dupont tried to share this information with Detective Taylor, who would not talk to him. Dupont also left a voicemail message for Brandhuber after appellant's arrest, but denied having tried to contact her.

Appellant testified that he had known Daniels and her husband, his uncle's neighbors, for up to 10 years. In late 2010 or early 2011, appellant began working for the Daniels as a nanny. He worked for them for one year. Sometimes Daniels gave him cash to pay for household items. Most of the time, however, he used one of three credit cards to pay for Daniels's purchases. Appellant believed he had Daniels's permission to use her credit card to pay for gas for her family's car, food for her children and groceries. Daniels usually paid appellant in cash, but sometimes asked him to use her credit card to buy things, in lieu of a cash payment. Appellant gave Daniels receipts for everything he bought using her credit card, whether for her family or for himself.

Appellant did not recall having seen the satchel Daniels's described at trial. He had seen some jewelry that Daniels asked him to sell for her, such as a gold chain, bracelets and a pin with a star. None of the jewelry was worth more than about $200. Daniels told appellant she needed cash but did not want her husband to find out she was selling anything, and drove appellant to the pawnshop. Primarily, they went to the Salter and Pacific pawnshops. Appellant was familiar with the buying and selling practices at both shops (including checking identification and fingerprinting), because he had done business at each in the past on his own or his mother's behalf. When appellant sold things to the pawnbrokers for Daniels he gave them his own driver's license and provided

his fingerprints. He gave Daniels the cash he received for her jewelry. Daniels never gave appellant cash from the sale of her property, but continued to give him access to and permission to use her credit cards for her family's household needs and as payment for his services.

Appellant had Brandhuber's permission to live in her West Hollywood apartment. The apartment manager gave appellant an "Occupant Approval" letter, dated September 29, 2011. Appellant and Brandeis, appellant's girlfriend, signed that letter which stated the rent was $400, but "negotiable," and moved in on October 1, 2011. Written on the letter, in the spot reserved for Brandhuber's signature, was the phrase, "Via telephone with [the apartment manager]." During the time appellant and his girlfriend lived in the apartment, two or three people whom they did not know had keys entered the apartment at will without appellant's or Brandeis's knowledge. Appellant had seen mail for more than 10 people delivered to the apartment; he assumed the people had come to collect their mail that was still being delivered to the apartment.

Appellant recognized two Visa cards ending in "4000," which he had photocopied. One card was in Brandhuber's name, and the other was in the name of Gabor Kranitz. Both cards expired in October 2013, and still bore activation stickers. Appellant found 20 credit cards in the name of Brandhuber or other people he did not know, but whose names he recognized from mail delivered to the apartment.

After appellant had lived in the apartment about five months, Brandhuber asked him to export some electronics with her to Hungary. To facilitate appellant's purchases, Brandhuber sent him four credit cards in his name and told him she had added him to her accounts. Appellant received a discount on rent from Brandhuber, or sometimes lived rent-free, in exchange for purchasing electronic products for her every week. A friend of Brandhuber's came by the apartment regularly to collect items appellant purchased for Brandhuber. Appellant's working relationship with Brandhuber soured after he questioned her about the 20 credit cards he found in her desk. She became angry and threatened to report him for fraud or to force him to pay for items he bought on her behalf using credit card accounts she opened in his name.

Appellant had no memory of what happened at Nordstrom on March 10, 2012, and no idea why he would take watches from the store. Before his arrest, appellant had persistent pain in his leg. Afterwards, appellant awoke in the Los Angeles Sheriff's Department's Intensive Care Unit, having undergone emergency surgery. Appellant later learned he had had a serious staph infection in his knee, and a fever of over 104 degrees on March 10, 2012.

## DISCUSSION

*1. Prosecutorial misconduct*

Appellant contends reversal is in order because the prosecutor's improper cross-examination of his uncle, which implied that appellant had a history of criminal conduct when in fact no such history existed, deprived him of a fair trial.

*a. Relevant facts*

Appellant's uncle testified in appellant's defense. On cross-examination, the following exchange took place:

"[Prosecutor]: And because you love [appellant], . . . you don't want anything bad to happen to him, right?

"[Dupont]: Of course.

"[Prosecutor]: And Alex has had some issues in the past, hasn't he?

"[Defense counsel]: Objection.

"THE COURT: I don't know what that means, counsel. The objection's sustained.

"[Prosecutor]: Has Alex had problems with the law in the past?

"[Dupont]: No.

"[Defense counsel]: Objection.

"THE COURT: Okay. Do you want the answer stricken?

"[Defense counsel]: I don't, but if we may approach.

"THE COURT: Not at this point. The objection is noted. The answer is no.

"[Prosecutor]: If Alex has had financial problems and things of that nature, have you ever bailed him out? Not bailed him out of jail, but bailed him out with money?

"[Dupont]: So far I understand Alex, so this is can be proved was working. He was finished high school.

"[Prosecutor]: I'm sorry. Maybe I didn't ask a question. Have you ever helped Alex out with money when he's needed it?

"[Dupont]: He never asked me for money."

At the end of Dupont's questioning, defense counsel requested to approach in order "to put something on the record." The trial court responded, "Not at this point. . . . What I'd like to do is proceed with the rest of the case . . . and then he can be recalled."

Later, outside the jury's presence, the following occurred:

"[Defense counsel]: "I just wanted to place on the record that [the prosecutor's] question regarding any prior brushes with the law was completely unacceptable, illegal and smacks of prosecutorial misconduct. And the [Health and Safety Code section] 11350 which is [appellant's] only brush with the law that then resulted in a DEJ dismissal does not count as moral turpitude, and so I would ask for a mistrial at this time and I'll submit.

"THE COURT: Okay. I believe I sustained the objection.

"[Defense counsel]: You did.

"THE COURT: Okay. And—

"[Prosecutor]: Moreover, your Honor, I didn't even know he had an [Health and Safety Code section] 11350 prior. That's not where I was going at all.

"THE COURT: In any event, I sustained the objection at this point without foundation or offer of proof, and no evidence presented as to that."

2.    *No prosecutorial misconduct occurred*

Prosecutorial misconduct is present when a prosecutor's question is inherently likely to elicit an improper response, and there is evidence the prosecutor posed the question intending to elicit such a response. A prosecutor may not ask improper or prejudicial questions. (*People v. Wash* (1993) 6 Cal.4th 215, 258 ["it is plainly misconduct to ask questions calling for inadmissible answers"]; *People v. Bell* (1989) 49

Cal.3d 502, 532 ["'The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct.'"].) Nor may the prosecution ask a question which is in the nature of an argument, assumes as proved a fact at issue or seeks irrelevant information. (*People v. Young* (2005) 34 Cal.4th 1149, 1186–1187.) "It constitutes misconduct to examine a witness solely for the purpose of implying the truth of facts stated in the question rather than in the answer to be given, and a prosecutor should not pursue a line of questioning that is damaging but irrelevant." (*People v. Dykes* (2009) 46 Cal.4th 731, 766.)

Prosecutorial misconduct violates the Fourteenth Amendment if it infects the trial with such fundamental unfairness as to make the conviction a denial of due process. (*People v. Lopez* (2008) 42 Cal.4th 960, 965; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Moreover, even conduct that does not render a criminal trial fundamentally unfair constitutes prosecutorial misconduct under California law if it involves the use of "'deceptive or reprehensible methods' in an attempt to persuade the jury." (*People v. Hill* (1998) 17 Cal.4th 800, 845.) What constitutes "deceptive" or "reprehensible" is determined by an objective standard. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) A prosecutor's questions will not amount to misconduct unless the record shows the prosecutor anticipated the witness's answers and purposefully asked questions to elicit inadmissible testimony. (*People v. Pinholster* (1992) 1 Cal.4th 865, 943, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

On this record, we cannot conclude the prosecutor purposefully aimed to elicit inadmissible evidence. In context, the prosecutor's question, though inartful and clearly improper, was designed to elicit evidence that Dupont had a life-long affection for his nephew, and a longstanding history and willingness to intercede on his behalf to help him out of a tight spot, financial or otherwise. The record also suggests that the reaction by defense counsel to the question, and concomitant motion for mistrial surprised the prosecutor, who immediately interjected that she "didn't even know [appellant] had an [Health and Safety Code section] 11350 prior," and that was not "where [she] was going at all." The matter was dropped. We are satisfied that the prosecutor's question, and

Dupont's stricken answer thereto, did not constitute prosecutorial misconduct. It was neither deceptive nor reprehensible.

3.    *There was no prejudice*

Assuming, for the purpose of discussion, that prosecutorial misconduct did occur, any misconduct was harmless. In our view, the record does not support a suggestion that the result was tipped in favor of the prosecution by the district attorney's single inartful question and Dupont's stricken answer. Again, we note that the prosecutor herself suggested she was surprised to learn that appellant had a "[Health and Safety Code section] 11350 prior." The question of appellant's criminal history was pursued no further. Nor does the record reflect that the issue was alluded to again at any subsequent time during trial. On this record, we cannot conclude that the prosecutor's single vague reference to appellant's "problems with the law in the past" rendered the trial fundamentally unfair, or in any way affected its outcome from an evidentiary standpoint.

Based on our review of the record, the evidence supporting appellant's guilt of the charged offenses was strong: There was testimony from Daniels regarding appellant's access to specific property stolen from her, and pawnbrokers identified appellant as the person who pawned those items. A Nordstrom's loss prevention agent testified that he personally had observed appellant steal numerous watches, and about his subsequent capture of appellant and recovery of the store property. And Brandhuber testified about unauthorized credit card purchases made by appellant on her accounts. The jury also heard testimony by Dupont that favored appellant, i.e., that he shared a close relationship with his nephew who, to his knowledge, had never before had problems with the law. Further, when the court asked whether she wanted the question and response stricken, his trial counsel declined. And, finally, the trial court instructed the jury it must decide the issues based solely on the evidence presented at trial, that statements made by the attorneys during trial are not evidence, and that it was not to assume to be true any insinuation suggested by a question asked a witness. We presume the jury followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) We conclude it is not reasonably probable appellant would have received a more favorable result in the absence

10

of the prosecutor's purported misconduct. Accordingly, the assumed prosecutorial misconduct was not prejudicial.

### 4. *Judicial bias*

Appellant contends the trial judge improperly intervened as an advocate for the prosecution by interposing his own questions to several witnesses. First, we first summarize the factual bases for these claims before turning to the merits of appellant's contentions.

#### a. *Questioning of Benavides*

After both sides completed their examinations of Nordstrom's loss prevention agent, the trial court questioned Benavides about his compliance with the store's policy following apprehension of a shoplifting suspect. After Benavides testified that he had photographed and prepared a written inventory describing the stolen merchandise, the court elicited details as to the identity and value of each item.[2]

#### b. *Questioning of Brandhuber*

During direct examination of Brandhuber, the trial court took over questioning from the prosecutor to elicit testimony regarding Brandhuber's fear of returning to her residence while appellant remained there, to clarify her efforts to contact banks and law enforcement agencies regarding the unauthorized charges, and to see if Brandhuber could identify appellant. The court again took over questioning from the prosecution to elicit testimony from Brandhuber which laid the foundation to establish the unauthorized credit card charges. The court also asked questions of the witness, the answers to which established appellant's access to Brandhuber's PayPal credit card during his stay in her apartment.[3]

---

[2] On two occasions, during the court's questioning of Benavides, appellant's counsel asked to approach to put something on the record. Those requests were denied.

[3] Appellant's counsel's request to be heard during the court's questioning of Brandhuber was denied. After Brandhuber was done testifying, the court permitted appellant's counsel to be heard outside the jury's presence. His attorney noted she was

### c. *Questioning of Wenzler*

At the outset of the prosecutor's direct examination of GE Capital Retail Bank fraud investigator Darla Wenzler, the trial court took over questioning the witness. Wenzler's answers to the court's questions established her status as custodian of records and her authority to access information from a specific PayPal account. After the court finished its questions, the prosecutor went on to establish through Wenzler that the specific account was Brandhuber's, to which appellant's name had been added.

### d. *Questioning of appellant*

After the prosecutor completed her cross-examination of appellant, the court engaged in its own lengthy examination. The court questioned appellant as to whether he ever met Brandhuber, the extent of and specific details regarding their telephonic contact, and how he came to live in her apartment. The court also asked questions regarding the nature of and specific details regarding appellant's involvement in Brandhuber's export business to Hungary, his access to her credit cards and how he came to have a card in his name on Brandhuber's account.

### e. *Appellant's contentions*

Appellant asserts that the trial court interjected itself into the questioning of witnesses in order to help the prosecutor establish her case, interfered with defense counsel's efforts to make a record as to evidentiary objections, and engaged in its own adversarial cross-examination of appellant. Appellant contends that taken together, the court's conduct "exceeded the purview of appropriate trial management or clarification and rose to the level of partisan assistance to the prosecution."[4]

---

"object[ing] for the record . . . to the court's taking over questioning from the [prosecution] regarding . . . elements necessary to prove certain counts." The court did not respond.

[4] We reject the Attorney General's contention that appellant forfeited this contention by failing to object adequately at trial. Appellant did not specifically object on the record to each of the court's questions with which he takes issue on appeal.

*f.* *Controlling law*

A trial court may control the examination of witnesses to ensure the efficient "ascertainment of the truth," and may examine witnesses on its own motion. (§ 1044; Evid. Code, §§ 765, subd. (a), 775.) "'[I]t is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible.' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 739.) To that end, the "court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

"'[I]f a judge desires to be further informed on certain points mentioned in the testimony it is entirely proper for him to ask proper questions for the purpose of developing all the facts in regard to them. Considerable latitude is allowed the judge in this respect as long as a fair trial is indicated both to the accused and to the People. Courts are established to discover where lies the truth when issues are contested, and the final responsibility to see that justice is done rests with the judge.'" (*People v. Carlucci* (1979) 23 Cal.3d 249, 255.) The court must, however, be careful in order to avoid taking on the role of either prosecutor or of the defense. "The court's questioning must be "'temperate, nonargumentative, and scrupulously fair'" [citation], and it must not convey to the jury the court's opinion of the witness's credibility. [Citation.]" (*People v. Cook*, *supra*, 39 Cal.4th at p. 597.)

---

Ordinarily, "the lack of an objection at trial forfeits the claim on appeal. [Citation.] However, a failure to object to judicial misconduct does not preclude appellate review when an objection would have been futile." (*People v. Houston* (2012) 54 Cal.4th 1186, 1220.) Appellant's counsel requested permission to approach several times. Those requests were denied. Appellant's attempted objections appear to have been timely, as they occurred shortly after the court's initial questions, and were raised several times thereafter. The court refused to entertain the objections or to allow appellant's counsel to make a record until after Brandhuber's questioning was concluded. The court's response to appellant's efforts rendered further objections futile.

13

Our role is to "'determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 78.) "We determine the propriety of judicial comment on a case-by-case basis in light of its content and the circumstances in which it occurs." (*People v. Cash* (2002) 28 Cal.4th 703, 730; see *People v. Sturm* (2006) 37 Cal.4th 1218, 1237–1243 [appellate court must independently analyze facts cumulative to determine whether under the circumstances judicial misconduct occurred].)

g.      *Analysis*

We conclude appellant has failed to show that the trial court stepped improperly into an adversarial role. Our thorough examination of the record reveals that the court asked clarifying, albeit numerous, questions of several witnesses during and after direct and cross-examination. A trial judge may question witnesses to clarify the evidence or fill in evidentiary gaps. (*People v. Hawkins* (1995) 10 Cal.4th 920, 947–948, overruled on another point by *People v. Lasko* (2000) 23 Cal.4th 101, 109–110.) Here, it is clear the underlying purpose behind the trial court's questions was twofold: to clarify confusing testimony and to control and efficiently advance the proceeding.

The court first sought to clarify confusing testimony. This is particularly apparent with regard to Brandhuber, a person of Hungarian descent, whose ability to speak and understand English was not well-developed, and who had difficulty responding to counsel's questions. The court's questions to Brandhuber were for the purpose of clarifying her testimony, and did not favor either side. This distinguishes the present case from *People v. Santana* (2000) 80 Cal.App.4th 1194, on which appellant relies. In *Santana*, the appellate court found the trial court improperly aligned itself with the prosecution by examining prosecution and defense witnesses in an apparent effort to impair the defense. (*Id*. at pp. 1207–1209.) The trial court adopted the prosecutor's terminology in questioning police officers elicited, belabored evidence from defense witnesses that was adverse to the defendant, and limited defense counsel's cross-examination of witnesses. (*Ibid*.) No similar misconduct occurred here. The trial court impartially elicited evidence from both prosecution and defense witnesses. Moreover,

appellant does not argue that the court interfered with or impaired his attorney's ability to cross-examine witnesses or present evidence, nor does our review of the record reveal any such impairment.

Second, the trial court interjected itself in a legitimate, albeit vigorous, effort to fulfill its duty to control the trial, and ensure it proceeded apace. The record reveals repeated instances in which the prosecutor's questions were vague, confusing or not aimed at eliciting relevant information. On several occasions outside the jury's presence, the trial judge chastised counsel not to continue to waste time, urging them to "focus on the donut, not the hole." The court was understandably frustrated, particularly by the prosecutor's redundant, roundabout and sometimes incomprehensible witness examination.[5] Notwithstanding its apparent perception that the prosecutor had difficulty posing appropriate questions, or that her method of questioning wasted an inordinate amount of time, the court also recognized it would clearly have been "'completely improper for [it] to advise the jury of negative personal views concerning the competence . . . of the attorneys in a trial. . . . When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client.' [Citation.]" (*People v. Sturm*, *supra*, 37 Cal.4th at p. 1240.) Instead, the court chose the more appropriate, cautious course and conducted its own examination.

---

[5] For example, during her direct examination of Brandhuber, the prosecutor asked Brandhuber questions seemingly directed at Brandhuber's inability to access her apartment after returning from Hawaii. The court stated, "Counsel, I'm losing this, so I need to clarify," and asked more direct questions. At another point, clearly frustrated with redundant questions and slow pace, the court interrupted the prosecutor's questioning regarding Brandhuber's emotional reaction to appellant's acts, stating, "Can I ask you a question, Counsel? Are these rhetorical questions?' Later, when the prosecutor posed inarticulate questions trying to elicit the identity of entities to which Brandhuber reported unauthorized charges, the court interjected to clarify, stating to the witness, "I think what she's trying to ask you . . . ." And, as noted above, the court deemed it necessary to take over Wenzler's direct examination to lay an appropriate foundation, after the prosecutor led off by asking the custodian of records an ill-conceived question about a screen shot of Brandhuber's PayPal account history.

"The trial judge has the duty to control all proceedings during the trial with a view to the expeditious and effective ascertainment of the truth regarding the matters involved. (Pen. Code, § 1044.)  To this end he may examine witnesses to elicit or clarify testimony.  [Citations.]  The mere fact that a judge examines a witness at some length does not establish misconduct, nor does the fact that the testimony elicited by the judge's questions would probably have been elicited by counsel.  [Citation.]"  (*People v. Pierce* (1970) 11 Cal.App.3d 313, 321; see *People v. Fudge* (1994) 7 Cal.4th 1075, 1108.)  It is difficult to assess on a cold record whether a particular question or series of questions by a judge went too far.  We cannot ascertain whether the tone of any particular question was anything but neutral, nor can we scrutinize the facial expressions or body language of a confused witness or juror and cannot, without proof, assume the court intervened inappropriately.  (*People v. Raviart* (2001) 93 Cal.App.4th 258, 272 [trial court is "'in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench'"].)

What is clear here is that the trial court repeatedly took it upon itself to direct the examination.  Even if the court asked more questions than were necessary, that does not mean it lost its neutrality.  There is nothing about the content of the court's questions demonstrates an absence of neutrality.  Finally, we observe that the trial court instructed jurors that, they were ultimate judges of the facts.  They were further instructed not to speculate why any objection had been sustained, nor to assume to be true any insinuation suggested by a question asked of a witness.  Finally, they were told that nothing the court said or did, or any questions it may have asked, was intended to intimate or suggest what they should find, or that the court believed or disbelieved any witness.  We presume the jury followed these instructions and considered each witness's answers, not the fact that questions were posed by the trial court, in its assessment of the evidence.  (See *People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.)  Accordingly, we find no judicial misconduct.

5.    *No cumulative error*

Appellant contends the cumulative effect of errors was prejudicial.  "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion

to the level of reversible and prejudicial error. [Citations.]" (*People v. Hill*, *supra*, 17 Cal.4th at pp. 844–845.) Here, the only potential error we have identified is that the prosecutor arguably committed borderline misconduct by suggesting that appellant had had problems with the law. We addressed that purported error above, and find no merit in appellant's cumulative error argument. (See *People v. Seaton* (2001) 26 Cal.4th 598, 675, 691–692 [minor errors, whether considered individually or cumulatively, would not alter the outcome of the trial].) As the California Supreme Court has stated, "A defendant is entitled to a fair trial, not a perfect one." (*People v. Mincey* (1992) 2 Cal.4th 408, 454.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.