Filed 1/11/16  P. v. Pacheano CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICARDO MONTELLANO PACHEANO,<br><br>    Defendant and Appellant. | B260438<br><br>(Los Angeles County<br> Super. Ct. No. TA121251) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Pat Connolly, Judge.  Affirmed.

Michele H. Kendall for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ricardo Montellano Pacheano appeals from a judgment sentencing him to two consecutive indeterminate terms of 15 years to life, plus a consecutive determinate term of 25 years in prison after a jury convicted him of four counts related to his sexual abuse of his young daughter, R. We affirm the judgment.

## BACKGROUND

Defendant and R.'s mother are divorced. During the summer of 2009, when R. was nine years old, she began to spend weekends and summer and winter school breaks with defendant. R.'s younger brother often joined her on those visits; occasionally her mother, Y., joined them as well.

Defendant lived with his parents, his sister, and his sister's five children in a three bedroom house. Usually, R. slept in defendant's room with defendant. There was only one bed, so R. shared the bed with defendant; sometimes her brother shared the bed with them as well.

On February 27, 2011, R. had just been dropped off at Y.'s home after a weekend visit with defendant. Y. was in the bathroom. R. came into the bathroom and went to the bathtub. Y. noticed that R. was hiding her "private part" and acting as though she did not want Y. to look at her, which was unusual. Y. noticed that R.'s labia were red and swollen, and asked her about it. R. seemed nervous, and did not say anything. Y. asked if anyone had touched her, and R. said no, that her father had just kissed her and touched her with his lips. Y. immediately called the police.

Deputy Alicia Kohno of the Los Angeles County Sheriff's Department spoke to R. that night. R. was very quiet and withdrawn, but she eventually told Deputy Kohno that she went to her father's house every weekend, and during those

2

times he would touch her on her private parts. She said that on the day before, her father had rubbed her private area and kissed it with his tongue.

Deputy Kohno took R. to Northridge Hospital to have a sexual assault (or SART) examination. Sandra Wilkinson, a sexual assault nurse examiner, performed the exam at 1:00 a.m. on February 28. As part of the exam, Wilkinson looked at R.'s body using a specialized light that shows where there might be seminal fluid or saliva. The light showed possible seminal fluid or saliva on the back of R.'s right thigh, and both inner thighs (where the labia majora meet the inner thigh). Wilkinson swabbed each of those areas, as well as R.'s external genitalia, and placed all the swabs in a SART kit, which she gave to Deputy Kohno. Wilkinson also took a history from R. about why she was there. R. told Wilkinson that she had been asleep on the couch with her father and he rubbed her vaginal area with his hand. She also said that in the past he had licked her vagina and she had felt his penis, which was like a bone.

Elizabeth Salinas, a senior criminalist with the Sheriff's Department, examined the SART kit from R.'s exam. She screened all of the samples in the kit for semen and saliva. She detected semen in the samples from R.'s vulva and left inner thigh, and detected saliva in both of those samples. She also detected saliva in the right inner thigh sample and the thigh sample. She forwarded the samples for DNA analysis.

The samples were analyzed by a criminalist in the Sheriff's Department's scientific services bureau, and the data was technically reviewed by another criminalist in the bureau, Cheryl Andersen. Andersen reported that DNA was found in the vulva sample. Because the vulva sample included semen, the sperm cells were separated from the epithelial cells, resulting in two samples. The DNA found in those samples was compared to reference samples obtained from R. and defendant. The DNA found in epithelial cell sample matched R.'s DNA. The

3

DNA found in the sperm sample was a mixture consistent with two contributors. Based upon the DNA profile from the sample, it was determined that R. was one of the contributors, and defendant was another possible contributor. According to Andersen, the probability that a random person could be a contributor based upon that DNA profile is approximately one trillion to one.

Defendant was charged by information with four counts: aggravated sexual assault of a child – oral copulation (Pen. Code,[1] § 269, subd. (a)(4), count 1); lewd act upon a child (§ 288, subd. (a), count 2); continuous sexual abuse (§ 288.5, subd. (a), count 3); and oral copulation/sexual penetration with a child under 10 years of age (§ 288.7, subd. (b), count 4). The information also alleged that defendant suffered a prior prison term (§ 667.5, subd. (b)).

At trial, R. testified that in 2009, defendant touched her vagina (both over and under her clothes) more than 10 times, put his fingers in her vagina more than five times, and put his mouth on her vagina more than 10 times; he also had her touch his penis with her hands more than 10 times, and had her put her mouth on his penis. In 2010, he had her touch his penis more than five times and put her mouth on his penis more than five times; he also put his mouth on her vagina more than 10 times. She testified that defendant also put his penis in her vagina more than five times in 2010.[2] With regard to the weekend in February 2011 when her mother asked her what was wrong, R. testified that her father touched her vagina with his hand while grabbing his penis. When asked why she did not tell anyone

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    The first time R. ever told anyone that defendant penetrated her vagina with his fingers or penis was at defendant's preliminary hearing, which took place in May 2013, more than two years after she first told her mother about defendant touching her. She was 13 years old at the time of the preliminary hearing, and was 14 at the time of trial. Prior to that, she had denied that defendant touched her with his penis or penetrated her vagina with his fingers when asked by her mother and by Deputy Kohno.

4

about her father's conduct before 2011, R. testified that she was afraid because she did not want him to go back to jail.

Defendant and defendant's mother testified in his defense.

Defendant's mother testified that she could not recall any time when R. was alone with defendant at their home, and that on most weekends when R. was there, there were a lot of children present in the home.

Defendant also testified that there were a lot of children and adults present in his home while R. was there. He denied ever touching R. in a sexual manner or performing any sexual act with her. On cross-examination, defendant admitted he was convicted of assault with a deadly weapon in 2001, and had a federal immigration conviction in 2011.

The jury found defendant guilty on all four counts. Defendant waived his right to jury trial on the prior prison term allegation, and the trial court found that allegation to be true. The court sentenced defendant to a term of 15 years to life in prison on count 1, the upper term of 8 years on count 2, the upper term of 16 years on count 3 (plus an additional year for the prior prison term), and 15 years to life on count 4. The court ordered the term on count 1 to run consecutive to the term on count 4, and the term on count 2 to run consecutive to count 3, for a total sentence of 55 years to life. Defendant timely filed a notice of appeal from the judgment.

## DISCUSSION

Defendant raises three issues on appeal. First, he contends the trial court failed to conduct a sufficient inquiry under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), and erroneously denied his motion to substitute counsel. Second, he contends he was denied the right to a fair trial due to judicial misconduct and the lack of judicial impartiality. Third, he contends he received ineffective assistance

5

of counsel due to counsel's failure to file a motion in limine to exclude evidence of defendant's prior convictions. None of his contentions is persuasive.

A.      *The Trial Court Did Not Err in Denying Defendant's* Marsden *Motion*

Defendant was arraigned on May 22, 2013. After numerous continuances (including seven motions by defense counsel to continue the trial), defendant's case was set for trial on June 16, 2014, as day 10 of 10. The prosecutor was engaged in trial on that day, however, so the trial was continued to June 19. On June 19, private counsel Carlos Perez, who was hired by defendant's family, sought to substitute into the case in place of the deputy public defender who had been representing defendant since the preliminary hearing. The trial court denied counsel's request, and both sides announced ready for trial. Voir dire began in the afternoon on that same day. At the start of the second full day of voir dire, defendant requested a *Marsden* hearing.

Once the courtroom was cleared, defendant addressed the court, saying: "All this time I've been in custody I haven't felt I had the proper representation. Now, I've been misled. And I've had like my witnesses that haven't been talked to, and I feel like I can't go forward with this. [¶] The reason why it was too late when they hired an attorney is because I kept believing in things that might have been – you know, that they were going to hire a private investigator in my case, which it was never done, and they would talk to potential witnesses, which was never done. And they never even went to the area to interrogate people or other reliable witnesses. And I feel like I'm going into this – this trial, practically – if you pardon my language – naked. [¶] . . . [¶] Also, like in the case where the 20 years [referring to the prosecutor's pretrial plea offer] – like I felt like my attorney is kind of practically telling me, 'take the 20 or take the 18, it's better than doing

6

life.' [¶] So it's like he has no faith in me, or he believes I'm guilty. So I cannot proceed like this, you know."

The trial court asked defendant whether he had brought the witnesses to his counsel's attention, and defendant responded that he had. The court told him that he would be asking counsel some questions, but it said it first wanted to address defendant's complaint that counsel had been urging him to take the plea offer. The court explained that the fact that counsel advised him to take the plea offer did not mean that counsel believed defendant was guilty. Instead, counsel was telling him that it was in his best interest to take the offer because if he were sentenced to life in prison, it was likely he would not get paroled for a very long time. The court noted that this kind of case was very difficult to defend, particularly with DNA evidence. It observed that defendant's counsel has "been an attorney for a long time. He's handled these cases. You have not handled these cases. You haven't been involved in these cases. He knows what happens. [¶] The reason why he's asking you to take that time is because he knows that – and I hate to say odds, but the odds are not in your favor."

While the court was speaking, it appears that defendant may have tried to interrupt a few times, because the court told defendant several times to "just listen to me." However, the court also told defendant that it was going to let defendant speak, once it heard from counsel.

The court then asked counsel about the witnesses defendant brought to his attention. Counsel explained that those witnesses were the young children who were living in the house when R. visited, and that he had decided not to call those young children as witnesses for several reasons. First, he noted that the prosecutor could argue that their testimony was not relevant because they were not alleged to be victims. Second, he was concerned that the children might "show signs of trepidation or fear on the witness stand, not because of anything [defendant] ever

7

could have done, but for the simple reason that they're young children seated inside of a courtroom, which can be a very intimidating place." Finally, he observed that during his cross-examination of Y. at the preliminary hearing, she acknowledged that she had brought all of her children to the home and never once felt like her children were in danger; he believed that having a prosecution witness acknowledge this was sufficient for the jury to understand defendant's argument without risking bringing small children into court.

The trial court agreed with counsel's assessment, noting that "you never know what a child is going to say." Defendant responded: "But – well, I feel the same way on that. But isn't it the same thing with my daughter the alleged victim. She could get manipulated by the mother." The court explained that R. already had testified at the preliminary hearing, and therefore would likely be testifying at trial. In response, defendant stated, "I still don't feel like I'm getting the proper representation, Your Honor." The court said that it was sorry that he felt that way, and denied defendant's *Marsden* motion.

On appeal, defendant contends that the trial court failed to properly exercise its discretion in denying his *Marsden* motion because the court did not give him an opportunity to respond to counsel's statements and did not listen to defendant's reasoning for requesting a change of attorney. We disagree.

"Under the Sixth Amendment right to assistance of counsel ""[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."" [Citation.] Furthermore, ""When a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate

8

specific instances of the attorney's inadequate performance.'"'" [Citation.]"
(*People v. Welch* (1999) 20 Cal.4th 701, 728; see also *Marsden*, *supra*, 2 Cal.3d at
pp. 123-124.)

"A trial court errs under *Marsden* by not affording a criminal defendant the
opportunity to state all his reasons for dissatisfaction with his appointed attorney.
[Citations.]  On the other hand, a defendant is not entitled to keep repeating and
renewing complaints that the court has already heard." (*People v. Vera* (2004) 122
Cal.App.4th 970, 980.)

In this case, the trial court gave defendant an opportunity to state his reasons
for requesting a change in counsel, and defendant gave two reasons:  (1) counsel
did not interview the other children who were staying at the house when R. visited,
and (2) counsel's advice to defendant to accept the plea offer showed that counsel
believes defendant is guilty.  Defendant's assertion that the trial court failed to
listen to defendant is contradicted by the record.  The record shows that the court
directly addressed each of the reasons defendant gave, explaining why those
reasons did not show that counsel was providing inadequate representation.  The
fact that the court told defendant to "just listen" while it was addressing counsel's
advice to accept the plea offer does not demonstrate, as defendant asserts, that the
court prevented defendant from giving *other* reasons for requesting new counsel.
There is no indication that defendant *had* any other reasons or examples of
counsel's purported lack of diligence or competence.  Indeed, when defendant was
given an opportunity to respond to the court, he simply made a general statement
that he did not feel like he was getting proper representation.

In short, the trial court did not err in its conduct of the *Marsden* hearing.  It
gave defendant ample opportunity to state all of his reasons for requesting a change
of counsel.  The reasons defendant gave did not demonstrate that counsel was not
providing adequate representation, nor did it demonstrate such an irreconcilable

conflict that ineffective representation was likely to result. Thus, we conclude the trial court did not abuse its discretion by denying defendant's *Marsden* motion.

B.      *Defendant Was Not Denied the Right to a Fair Trial*

Defendant contends that he was denied the right to a fair trial because the trial court made comments demonstrating misconduct and a bias against him. We find no evidence of misconduct or bias.

"Defendant has a due process right to an impartial trial judge under the state and federal Constitutions. [Citations.] The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, disapproved on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Typically, in cases in which a defendant asserts judicial misconduct or bias, the judicial conduct at issue took place in front of the jury. (See, e.g., *People v. Ottey* (1936) 5 Cal.2d 714 [defendant argued trial court committed misconduct by questioning defendant on witness stand and making comments to jury regarding credibility issues; no misconduct found]; *People v. Santana* (2000) 80 Cal.App.4th 1194 [trial court questioned witnesses in front of jury in a manner suggesting a desire to assist the prosecution; conviction reversed]; *People v. Moore* (1974) 40 Cal.App.3d 56 [trial court made comments to jury that inaccurately summarized the evidence and ignored evidence favorable to defendant; conviction reversed].) Thus, the focus of the reviewing court in those cases was on whether the trial court by its conduct invaded the province of the jury, and thus deprived the defendant of his right to trial by jury. (See, e.g., *People v. Sanders* (1995) 11 Cal.4th 475, 531-532; *People v. Ottey*, *supra*, 5 Cal.2d at p. 729.)

10

In this case, however, defendant's claim of judicial misconduct and bias is based upon two exchanges between the trial court and defendant and/or his counsel that did *not* take place before the jury. Therefore, we must examine whether those exchanges demonstrate that the trial court had "actual bias against the defendant or interest in the outcome of the case." (*People v. Guerra, supra*, 37 Cal.4th at p. 1111.)

The first exchange took place right after the case was sent out for trial, while the prospective jurors were waiting outside the courtroom. The court brought defendant out to speak to him about the plea offer made by the prosecutor. The court explained that it had spoken to the prosecutor and defense counsel about the case, and about whether the offer was one that defendant should seriously consider.

The court told defendant that he was looking at a life sentence, and that it might be difficult for him to make parole with the charges he was facing. It noted it understood that the victim was defendant's biological daughter, that she testified at the preliminary hearing, and that she would be testifying at trial about multiple incidents of sexual intercourse and other sexual incidents. The court then stated, "I'm just talking about from a pragmatic or practical standpoint. All right. One of the things [defense counsel] asked is whether I'd allow you to put makeup on your face. [Counsel interrupted to say that he had discussed it with defendant, and defendant did not wish to cover up the Dodgers logo on his face.] That's fine. [¶] Let me say this. Because you've got other things to worry about. What I was going to say is I would allow that, but LA or not LA, whatever kind of tattoos you have, that pales in comparison to when a jury hears these kinds of charges, and actually hears from a biological daughter speaking about her father. Okay. It carries a lot of weight. It is not going to make anyone sympathetic towards your plight, nor empathetic. [¶] . . . [¶] So no one is going to feel bad for you, is what I'm saying. And, look, I'm not talking about from a standpoint of legal, I'm just

11

talking about from a common sense standpoint. [¶] . . . [¶] And you also have a hurdle that is going to be, perhaps, insurmountable, meaning you're not going to be able to get over the fact that DNA is found on her, in an area that is consistent with what she's going to be testifying to. [¶] And, look, [defense counsel] is an excellent attorney. [The prosecutor] is an excellent attorney. So it's not like we have something – like a situation where your attorney is that much better or the DA is that much better, that's not what the situation is here. But no matter how good [defense counsel] is, he can't change those DNA results." The court noted that in his years as a judge and before that as a prosecutor, he had seen many defense attorneys deal with DNA evidence, but had never seen any of them be successful, because once jurors hear that "DNA is consistent with one person in X number of zeros, . . . for all intents and purposes their mind is made up." The court explained, "Now, I'm telling you these things because once that jury comes in, then the offer is not going to be available to you."

Defendant contends that these statements show that the court was biased against him because the court was "advocating that the evidence the People will be presenting would be greater than any defense the [defendant] could possibly present." We disagree that the court was "advocating" anything. Rather, the court was simply noting, based upon its years as a judge and prosecutor and its conversation with the prosecutor and defense counsel, that successful defense of this case was going to be very difficult. The court did not express any opinion about defendant or his guilt; it merely urged him to seriously consider the plea offer in light of the difficulty of mounting a successful defense. Those comments do not demonstrate that the court was biased against defendant.

The second exchange that defendant relies upon also fails to demonstrate bias. In that exchange, the trial court noted that it spoke to the prosecutor and defense counsel in chambers about whether the prosecutor would be allowed to

12

elicit testimony from R. that the reason she did not report the sexual abuse earlier was because she did not want to see her father go back to jail. The court stated: "Over the defense objection, the court is going to allow that. I think that it would be a reason for there being a late disclosure. That even if there were to be no questions by [defense counsel] in that area, that it is still a question that would be asked by the jury. And so I will allow that."

Defendant argues that this statement by the court demonstrates that it has a bias against him because jurors are not allowed to ask questions, and the court allowed the admission of prejudicial evidence "merely because the trial court felt the jury would ask about it." He is mistaken.

The trial court has a duty to "see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible." (*People v. Carlucci* (1979) 23 Cal.3d 249, 255.) In this case, the trial court determined that the testimony at issue was relevant and necessary to answer questions the jury was likely to have about why R. did not report defendant's sexual abuse earlier. (See *People v. Santana*, *supra*, 80 Cal.App.4th at p. 1206 ["the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination"]; accord, *People v. Abel* (2012) 53 Cal.4th 891, 917.) The trial court's assessment was reasonable, and does not demonstrate any bias against defendant.

C. *Defendant Has Not Established He Received Ineffective Assistance of Counsel*

At trial, defendant testified in his defense, and the prosecutor impeached him with his prior convictions for assault with a deadly weapon and for violation of federal immigration law. Defendant contends he received ineffective assistance of counsel because his attorney failed to file a motion in limine to exclude evidence

13

of those prior convictions, and therefore the judgment should be reversed. We disagree.

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

In this case, the record provides a satisfactory explanation for why defense counsel did not make a motion in limine to exclude evidence of defendant's prior convictions: before testimony began, the trial court stated that it would allow impeachment with those convictions. Even if the trial court had not made that statement, it was reasonable for defense counsel not to move to exclude evidence of those convictions, because at least one of them (assault with a deadly weapon) involved a crime of moral turpitude and thus was admissible for impeachment purposes. (See, e.g., *People v. Hinton* (2006) 37 Cal.4th 839, 888.) Thus, defendant failed to meet his burden to establish that his counsel's performance was deficient.

14

In any event, even if defendant had established that his counsel's failure to file a motion in limine constituted deficient performance, he did not demonstrate that counsel's alleged error was prejudicial. "To prevail on a claim of ineffective assistance of counsel, a defendant '"must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice."' [Citation.] . . . [T]he record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Given the overwhelming evidence of defendant's guilt – R.'s testimony and DNA evidence that corroborated that testimony – there is no reasonable probability that the result would have been different had defendant's prior convictions been excluded. (*People v. Sapp* (2003) 31 Cal.4th 240, 280 [ineffective assistance claim failed where there was overwhelming evidence of guilt].) Therefore, defendant's ineffective assistance claim fails.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.                COLLINS, J.

15