[No. B127238. Second Dist., Div. Three. May 23, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN SANTANA, Defendant and Appellant.

**COUNSEL**

Guzin & Steier and Donald H. Steier for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and April Sylvester, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Defendant and appellant Juan Santana appeals the judgment, entered after conviction by jury, of possession for sale of methamphetamine exceeding 10 kilograms by weight and possession for sale of cocaine. (Health & Saf. Code, §§ 11378, 11370.4, subd. (b)(3), 11351.) As to both counts, the jury found a principal had been armed in the commission of the offense within the meaning of Penal Code section 12022, subdivision (d). The trial court sentenced Santana to a term of 13 years in state prison.

### SUMMARY STATEMENT

The People's evidence revealed Santana had been present at the scene of an anticipated sale of nine pounds of methamphetamine and that, 10 months later in a search of his home, deputies found a triple beam Ohaus scale and

cash. Santana contends the evidence was insufficient to support his conviction, the trial court erroneously failed to instruct on the concurrence of act and intent, and the trial court improperly intervened to such an extent in the trial of the case that reversal is required. We reject Santana's claim of insufficient evidence but agree the manner in which the trial court conducted the trial requires reversal of the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Prosecution's evidence.*

Viewed in accordance with the usual rule of appellate review (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the evidence established that on July 8, 1997, South Gate Police Detective Darren Arakawa learned through information obtained in a wiretap that nine pounds of methamphetamine were going to be sold that day at apartment No. 30 at 13979 Garvey Avenue in Baldwin Park. At approximately 3:30 p.m., Arakawa and other officers approached the apartment and saw Catalino Perez standing at the open door. Perez made eye contact with Arakawa and retreated into the apartment. When Arakawa arrived at the door, he saw Santana "laying on the sofa." In addition to Perez and Santana, Santana's ex-wife, their eight-year-old daughter and another male were present.

In a bedroom of the apartment, officers found 284.4 grams of methamphetamine wrapped in pink cellophane, 4,098.2 grams of methamphetamine wrapped in clear cellophane, and 13 individually wrapped packages containing almost two pounds of powder cocaine. In the trunk of a 1986 Cadillac registered to Omar Martinez, which was parked in the space assigned to apartment No. 30, officers found a package wrapped as a birthday present which contained 23 packages of methamphetamine. The parties stipulated that six of the 23 containers had been "analyzed . . . and found to be 2,692 grams of solid substance containing methamphetamine. The other 17 containers had a total weight of 8,093.5 grams and were not examined."

"[S]tashed . . between the cushion and the actual frame of the sofa" "right where [Santana's] behind" had been on the sofa, officers found a roll of one hundred fifty $100 bills. There was a semiautomatic handgun approximately eight feet from the sofa, on a counter which separated the kitchen of the apartment from the living room. The weapon was "cocked and locked" and two additional magazines were next to it. On the same counter was an IRS income tax refund check in Santana's name addressed to the Garvey Avenue

apartment and a resident alien card in Santana's name. Officers also found packaging material and a digital scale in the bathroom, $2,500 under a bed, $32,800 in a purse, and $2,049 in a drawer.

Approximately half an hour after the officers arrived at the apartment, Rofeno Herrera came to the door. Herrera appeared surprised to see the officers in the apartment and stated he was there to obtain $15,000 to purchase a vehicle.

Arakawa opined the contraband found at the apartment had been possessed for the purpose of sale based on the quantity of drugs present. Also, based on his experience, a drug trafficker generally would not allow an uninvolved individual to be present at the scene of a drug transaction.

At the time of the search of the Garvey Avenue apartment, Santana told the officers he lived in Victorville and that he had been present at the apartment to visit his daughter. Santana was not charged in this case until after his arrest, approximately 10 months later, on May 28, 1998. On that occasion, Santana gave San Bernardino County Sheriff's Deputy Michael Wirz permission to search Santana's residence at 9239 Baldy Mesa Road in Phelan. In the garage of the residence, Wirz found an Ohaus triple beam scale with white powder residue on it. Wirz testified a triple beam Ohaus scale weighs in grams and is used to weigh "very small weight amounts." Near the scale Wirz found packaging materials and some Federal Express boxes from which the labels had been removed. Inside the Federal Express boxes Wirz found "duct tape and plastic wrap along with dryer sheets, which are typically used to hide the scent of different types of narcotics [sent] through the mail . . . ." Wirz found a 1980 Corvette registered to Omar Martinez in the garage, approximately $1,500 in a children's room, and approximately $3,000 behind a dresser.

2. *Defense evidence.*

Santana's wife, Teresa Duarte, testified she and Santana had been married in Mexico on November 5, 1992, and that they lived together in Phelan with their two children and a boarder. Duarte claimed they kept cash in a children's room to hide it from thieves, she used the triple beam Ohaus scale found in the garage to weigh the components of bread she bakes in her home, and that Santana operated a carpet installation business known as Saul's Carpet in partnership with Saul Ramirez.

Ramirez testified Santana enjoyed a reputation as a law-abiding citizen, and that they operated a carpet sales and installation business.

Santana testified in his own defense that he had been at the Garvey Avenue apartment to visit his daughter, who lived there with her mother, and to pick up a tax refund check that had been mailed to that address to prevent his wife, Duarte, from learning that Santana intended to give the refund to his daughter. Santana indicated he had his resident alien card with him in order to cash the check because he had lost or misplaced his wallet, the card had been loose in his pocket, and he had placed the card on the counter to keep it from getting ruined. Santana testified he saw no cash or narcotics while he was at the apartment and did not notice a handgun on the counter. Santana claimed he kept cash hidden in the children's dresser because that was the only place he had to store such things. Santana indicated he and Ramirez were equal partners in the carpet business.

## CONTENTIONS

Santana contends the evidence is insufficient to support the conviction, the trial court intervened as an adversary in the trial, and the trial court erroneously failed to instruct on the concurrence of act and specific intent.

The People contend the abstract of judgment must be modified and corrected in various respects.

## DISCUSSION

### 1. *No insufficiency of the evidence appears.*

Santana contends there was insufficient evidence to show he controlled the Garvey Avenue apartment or possessed the contraband found there. Santana argues the evidence showed only that he had been visiting his eight-year-old daughter at her mother's apartment to give a tax refund to his daughter, no drugs were found in his possession, none of the drugs or money found in the apartment were visible from the sofa he occupied, and no fingerprints connected him with the drugs or money. Santana further asserts the amount of methamphetamine analyzed was insufficient to support the quantity enhancement and it must be reversed.

Santana's claims relating to the sufficiency of the evidence to support the underlying charges must be rejected. The evidence showed Santana had been present at the scene of an anticipated sale of nine pounds of methamphetamine, Santana's tax refund check and resident alien card were found in close proximity to a loaded weapon and two extra magazines in plain view at the scene, an individual arrived at the apartment 30 minutes after the officers to obtain $15,000 to purchase a vehicle, $15,000 in cash was found in the

sofa where Santana had been seated when the officers arrived to intercept the sale, and the Cadillac in which more than 10 kilograms of methamphetamine were found was registered to the same individual who owned the Corvette found in Santana's garage in Phelan 10 months later. This evidence, although circumstantial, clearly was sufficient to establish that Santana was involved as an aider and abettor in the possession for sale of the narcotics found at the Garvey Avenue apartment. (*People* v. *Rodriguez, supra,* 20 Cal.4th at p. 11.)

Regarding Santana's attack on the weight enhancement, the parties stipulated, inter alia, that six of the 23 containers found in the gift wrapped package in the trunk of the Cadillac had been analyzed and found to be 2,692 grams of solid substance containing methamphetamine. The remaining 17 containers found in the package weighed 8,093.5 grams but were not analyzed. However, given the manner in which the 23 containers were packaged, and based on the analysis of the containers that were tested, the jury reasonably could infer that each of the 23 containers found in the gift wrapped package in the trunk of Omar Martinez's Cadillac contained methamphetamine even though only six of the containers had been analyzed. When the weight of the unanalyzed containers is included, the total amount of methamphetamine recovered, 10,789.5 grams, exceeds the 10 kilogram amount required to support the enhancement.

In sum, Santana's attack on the sufficiency of the evidence fails.

2. *The trial court's adversarial intervention in the trial requires reversal of the judgment.*

Santana contends the trial court intervened as an adversary in the trial on numerous occasions. We first summarize the factual bases for these claims and then address the merits of Santana's contentions.

a. *Questioning of Arakawa.*

During direct examination of Arakawa, the prosecutor asked whether it would "be a common practice that a drug trafficker would allow an uninvolved person to be present [when] a transaction of say any more than a pound or two was going to occur?" When Arakawa responded affirmatively, the prosecutor asked: "They would allow an uninvolved person there?" Defense counsel objected on the ground the question had been asked and answered, but the trial court indicated it was not sure Arakawa had understood the question. Arakawa then indicated he thought the prosecutor had asked whether more than one person would have been involved in this

transaction. The trial court advised Arakawa the prosecutor had asked, "Would a drug trafficker have an outsider present while he sells his drugs?" Arakawa responded, "No, generally not, no."

### b. *The trial court's claimed use of the prosecutor's terminology.*

Santana cites as error three instances in which the trial court assertedly adopted the prosecutor's terminology. The first occurred when the trial court asked Arakawa if Herrera, the man who came to the door of the apartment during the search, "made" Arakawa as a police officer. Second, during the questioning of another officer, the trial court asked if Herrera stated his purpose for being at the apartment and whether Herrera knew the individuals in the apartment were police officers. Third, during questioning of the same officer regarding the $15,000 which had been found in the sofa, the trial court asked·a line of questions that sought to determine where the money had been "stashed."

### c. *Questioning of Wirz.*

During cross-examination of Deputy Wirz regarding the search in Phelan, defense counsel noted Wirz had been refreshing his recollection based on the investigation report and asked Wirz to indicate where the report stated a white powder residue had been found on the scale. When Wirz replied he did not recall seeing that in the report, defense counsel asked Wirz to "look through the report." The trial court indicated: "You can't cross-examine him on somebody else's report, counsel. He can use it to refresh his recollection. You can't cross-examine on it. He didn't make the report. Maybe the person that made the report didn't do the same things this detective did. So you can't cross-examine him on the report." Defense counsel responded, "It's not in the report is the point." The trial court replied, "Counsel, that's my ruling."

After Wirz testified he not only told the officer who wrote the report about the white powder on the scale but also showed it to him, defense counsel asked, "Sir, is [that] anywhere indicated in the report . . . ?" The trial court precluded an answer and stated: "Counsel, I am only going to tell you one more time and that is now, that you may not cross-examine him on another officer's report."

### d. *Questioning of Duarte.*

After eliciting from Duarte, Santana's wife, that she had carried Santana's business card in her purse for approximately three years, defense counsel

asked, "Did you just print that card up for the trial?" The trial court stated, "[She] [s]aid she had it three years. Now I don't know how she could have it for three years and print it for the trial both. The questions are tending to be redundant, counsel. She said she had it for three years."

During the prosecutor's cross-examination of Duarte about her use of the triple beam Ohaus scale in baking, the trial court asked: "Do you ever bake a single loaf of bread?" Duarte responded, "No. More." When the trial court asked how many more, Duarte indicated she did not know the exact quantity. The trial court again asked, "How many loaves of bread will you bake at one time?" Duarte replied she had never counted them. The trial court asked, "You don't know ever how many you make?" Duarte responded, "The truth is I have never really counted them. But, approximately, I don't know. Just whatever I need." The trial court then asked Duarte's recipe for bread. Duarte replied flour, butter and sugar. The trial court asked how much flour was needed. Duarte replied, "It depends on the quantity that one wants to cook. More or less about five, five pounds." The trial court inquired why Duarte needed "such a precise scale to measure out such approximate quantities." Duarte replied, "Because that's how I can find out how much I am going to put of lard or of flour or butter." When the trial court asked how much butter was required, Duarte responded, "Not butter, lard. But two or three pounds." Thereafter, the prosecutor resumed cross-examination.

### e. Questioning of Ramirez.

During Ramirez's testimony, a partnership tax return for Ramirez's business with Santana was marked as a defense exhibit. After the prosecutor had completed cross-examination of Ramirez, the trial court asked Ramirez whether he was a 20 percent partner in the business. Ramirez replied he and Santana were partners. The trial court asked Ramirez to "[l]ook at your partner's share of income on this return. See if this doesn't say you are a 20-percent partner; and look at Santana's and see if he is an 80-percent. Is that what it says? Is that what it says?" When Ramirez agreed that was what the return indicated, the trial court asked, "It says that you made $2,800 for the year; is that correct?" Ramirez indicated he was unsure. The trial court replied: "That's about $50 a week and you spend three, four, five days a week at this business to make $50 a week?" Ramirez replied: "There are instances where I am referring to expenses and everything. I have employees I have to pay also." The trial court responded, "I am talking about the money that you took home from this business that you reported, $2,849, correct?" Ramirez agreed. The trial court continued, "I understand business could be slow, but I wonder how you could spend . . . almost all of your working week there when the business is doing so little?" When Ramirez indicated he

sometimes was paid in cash to install carpet the trial court replied, "Other times you sit around the office with nothing to do?" Ramirez replied he also worked at homes and painted and that his wife was employed as a supervisor at a clothing factory. The trial court then stated: "The reason I am asking you these questions is because you said you saw Mr. Santana almost every day and I wonder how you could spend so much time at this business if it's only paying you $50 a week." Ramirez replied, "I do it because I know it's going to pay off and I am putting up with that. I have no other option. That's what I know . . . how to do."

After the prosecutor commenced recross-examination of Ramirez, the trial court asked, "I don't understand why you didn't know that you are a 20-percent partner?" Ramirez replied, "I didn't know really. We have never really made any money at it. I don't have any money. Why fight about it?" The trial court asked, "Who decided 80/20?" Ramirez indicated the accountant, but added he thought they had been equal partners. Ramirez thereafter testified their verbal agreement was to split the profits equally, Ramirez did not believe Santana was taking advantage of him and nothing in the tax form changed Ramirez's opinion of Santana.

During a recess in the cross-examination of the next witness, defense counsel objected to the trial court's cross-examination of Ramirez and stated: "I think that there was a real strong cross-examination by the court. I think that perhaps the jurors could take a cue from that. Perhaps have a limiting instruction. But the jurors could take a cue from that, and perhaps the impartiality which we should be having may have been lost." The trial court responded, "You have to get used to it, counsel. I do not consider my position here to be one as a potted plant or an umpire just calling balls and strikes. It's my duty, I believe, to bring out all of the evidence that the jury needs to reach a fair and impartial verdict. I reserve the . . . right to ask questions of witnesses. [¶] I will instruct the jury that they are not to take any cue from the questions asked by the court. And my motive is only to bring out testimony that hasn't at that time been fully covered by the questions of counsel. [¶] So your objection is noted and it will be overruled."

When the jury returned to the courtroom, the trial court indicated, "Ladies and gentlemen, there is something I meant to tell you before, and I will tell you now, and I will repeat it when I give the final instructions. [¶] I very frequently ask questions of witnesses in cases. Different judges have different policies and I am more active in doing that than some. I try to bring out facts that I think have not been sufficiently brought out by [the] questions of counsel. You are not [to] take any cue from what I say. You are not to think that I have any particular opinion about anything on the case. I am just trying

to bring out more information so you have all of the facts that you need
. . . ." The trial court similarly instructed the jury at the close of the case.[1]

f. *Questioning of Santana.*

During cross-examination, the prosecutor asked Santana the address of the carpet business. Santana started to reply, "Between Main—," but the trial court interrupted and asked, "What is the address, sir?" Santana then explained he was illiterate and knew only "that more or less it's between Main and Olivas, something like that. I just don't know how to tell you those words."

The trial court thereafter questioned Santana about how he learned the tax refund check had arrived at the Garvey Avenue apartment, where he intended to cash the check, whether he had brought the resident alien (green) card with him as identification to cash the check, and why Santana had placed the green card on the counter "with the check near the gun? You weren't in the bank. Why didn't you wait until you were in the bank to take the green card out?" When Santana responded he would not have put the green card with the check had he known what was going to happen, the trial court again asked "why take the green card out and put it with the check in the house. You are not going to cash the check in the house." Santana replied, "If I have the check in my pocket and I am about to sit down—," the trial court interrupted and asked, "Why would it be there in your pocket if it came to the house?" Santana explained, "No. In other words, if I have something in my pocket, if I have the I.D. in my pocket, if I don't have my wallet, it's going to get ruined. . . . [¶] . . . [¶] . . . So I put the I.D. there where the check was." The trial court continued, "But I will try one more time. [¶] Why take the I.D. out of your pocket before you need it? You don't need it until you go to the bank. Why take the I.D. out and put it on the counter there?" After Santana twice replied he put the I.D. next to the check, the trial court asked, "my question is, why do you do that?" Santana responded that when he arrived in the apartment, he placed the green card on the counter. When Santana indicated in response to a question from the prosecutor he had not left the card in his car because he was afraid it would

---

[1]During the closing instructions, the trial court advised the jury: "The Court often asks questions of witnesses to ensure that all facts relevant to their testimony be brought out. I do that in practically ever case. I make sure that the witnesses are thoroughly examined so the jurors can get all the facts; that the attorneys don't have certain questions, I generally do. So don't think that that has any special meaning in this case. [¶] I have not intended by anything I have said or done or by any questions that I may have asked or by any ruling I may have made to intimate or suggest what you should find to be the facts or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusions."

be stolen, defense counsel objected "to the whole line of questioning, from the beginning from when the court is inquiring to now . . . with [the prosecutor] picking up . . . ." The trial court noted and overruled the objection. Shortly thereafter, the trial court asked Santana whether it was possible the green card had been at the apartment when Santana arrived. Santana replied, "How could it be there if I was telling you that I took it there? How could it be there before me." Defense counsel then requested a running objection which the trial court noted.

Thereafter, outside the presence of the jury, defense counsel stated, "I just wanted the record to reflect, your Honor, it's not so much that the court basically cross-examined my client for about ten minutes and then the prosecutor was able to . . . pick up after the court was done and keep running with the ball, but it was also the fact that in my opinion the court was also . . . using facial expressions, and the facial expressions to me indicated . . . the court is not believing my client . . . ." The trial court denied it had made any facial expressions and advised defense counsel that "it's the judge's obligation to make sure that all the evidence . . . is brought out, and I feel free to question any and all witnesses when I'm not satisfied that all the questions that should have been asked have been asked."

During redirect examination, Santana explained he had feared the resident alien card would get ruined in his pocket or stolen from his vehicle. Santana testified he did not notice the handgun when he placed the green card on the counter because it was not his custom to "go looking" around someone else's apartment. Santana had his green card in his pocket because he recently had lost his wallet. The trial court asked Santana, "Did you know that officers found drugs in this apartment."

g. *Santana's contentions.*

Santana asserts the trial court's conduct, in a case which was defended on the theory Santana innocently had been present at the scene, improperly swayed the jury to believe Santana was guilty. Santana asserts the trial court became more aggressive during the defense portion of the case, "cross-examining [defense witnesses] for pages of transcript, and obviously arguing with them."

Specifically, Santana asserts the trial court led Arakawa "to reverse his testimony" regarding whether an uninvolved person would be present at a drug sale, and improperly assisted the prosecutor during cross-examination of deputy Wirz by reminding defense counsel "it's not his report." Santana claims the trial court's questions regarding Herrera's knowledge of the

officer's presence called for speculation and would have been objectionable had they been asked by the prosecutor, and that the other questions on this topic improperly adopted the prosecutor's terminology which implied Santana had acted in a guilty manner.

Santana asserts the trial court belittled defense counsel in the eyes of the jury during defense counsel's examination of Duarte with respect to the business card, and the trial court's questions of Duarte regarding the triple beam scale reveal "a sustained effort to destroy [Duarte's] credibility" which "included improper cues to the jury that could not be cured by the Court's later cautionary instruction."

Santana claims the trial court's cross-examination of Ramirez revealed a "blatant attempt to show the carpet business was a front or perhaps even non-existent" and the inquiry into whether Ramirez was happy knowing the tax form indicated Ramirez was only a 20 percent partner "ma[d]e it appear to the jurors that [Santana] had even cheated his partner, and was not to be trusted in anything." Santana asserts the trial court's interruption of Santana's description of the location of the partnership business conveyed to the jury the trial court's lack of belief in Santana's testimony, and the trial court's questions about Santana's green card and why it happened to be on the counter of the apartment were objectionable, belabored the point and apparently were accompanied by inappropriate facial gestures. Finally, Santana argues the trial court's question regarding whether Santana was aware of the presence of drugs in the apartment appears to have been intended to show Santana was a neglectful parent who allowed his daughter to live in an apartment where the police suspected narcotics activity.

Santana concludes the cumulative effect of these errors prevented a fair trial and that reversal is required.

h. *Relevant law.*

■ A court may control the mode of questioning of a witness and comment on the evidence and credibility of witnesses as necessary for the proper determination of the case. (*People v. Calderon* (1994) 9 Cal.4th 69, 75 [36 Cal.Rptr.2d 333, 885 P.2d 83]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1108 [31 Cal.Rptr.2d 321, 875 P.2d 36]; Pen. Code, § 1044.) Within reasonable limits, the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination. (*People v. Carlucci* (1979) 23 Cal.3d 249, 255-256 [152 Cal.Rptr. 439, 590 P.2d 15].) A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the

prosecution. (*People v. Carpenter* (1997) 15 Cal.4th 312, 353 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Fudge, supra,* 7 Cal.4th at p. 1107; *People v. Clark* (1992) 3 Cal.4th 41, 143 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

i. *Application here.*

 Measuring the claimed instances of misconduct against the standard stated above, we conclude the trial court intervened as an adversary to such an extent as to require reversal of Santana's conviction. Putting aside the more innocuous incidents such as the trial court's use of the prosecutor's argot in the questioning of officers, the manner in which the trial court instructed defense counsel not to cross-examine Wirz on the contents of another officer's report, and the trial court's objection when defense counsel asked whether Duarte had printed the business card for the purpose of trial, the record before us reveals the trial court repetitiously, disparagingly and prejudicially questioned defense witnesses Ramirez, Duarte and Santana. The trial court's questioning of Duarte regarding use of the triple beam Ohaus scale in baking, the questions of Ramirez regarding the partnership agreement and business, and the questioning of Santana regarding the resident alien card, all consumed more time than was necessary to elicit the point the trial court sought to make. By belaboring points of evidence that clearly were adverse to Santana, the trial court took on the role of prosecutor rather than that of an impartial judge. By continuing this adversarial questioning for page after page of reporter's transcript, the trial court created the unmistakable impression it had allied itself with the prosecution in the effort to convict Santana. These instances of impropriety are so egregious as to require reversal of Santana's conviction.

The People argue the repeated admonitions not to take any cue from the trial court's manner of questioning witnesses, and the fact the trial court questioned both prosecutor and defense witnesses, operate to dispel any prejudice. We disagree. The admonition, however often it was repeated, could not dispel the inference, which appears on the face of the cold record, that the trial court found the People's case against Santana to be strong and Santana's evidence to be questionable, at best.

Although the trial court may have questioned both prosecution and defense witnesses, in each instance, the trial court's questioning appears to have been motivated by a desire to assist the prosecution's case. For example, the trial court's questioning of Arakawa occurred after the trial court realized Arakawa had misunderstood the prosecutor's question regarding the possibility a disinterested third person might be present at the scene

of a drug sale. Rather than leaving the matter for the prosecutor, the trial court immediately repeated the prosecutor's question, elicited Arakawa's admission he had misunderstood the question, and personally established that, generally, this would not occur.

The absence of evidence in the record to support Santana's claim the trial court made facial gestures indicating disbelief of Santana's evidence does not convince us the questioning was innocuous. Even had the trial court conducted its cross-examination in deadpan, the tone of the examination, as well as its purpose, is evident.

Regarding prejudice, the People assert any error must be seen as harmless in light of the substantial evidence of Santana's guilt. We are not persuaded. Although the evidence of guilt was sufficient to uphold the conviction, it was entirely circumstantial. A jury views such evidence differently than direct evidence of guilt and, absent the trial court's intervention, might have found Santana's explanation of the suspicious circumstances adequate to avoid the conclusion the People had proved the case beyond a reasonable doubt. Indeed, the trial court may have become involved in the prosecution of this case precisely because the evidence against Santana was circumstantial. That is, the trial court appears to have undertaken a misguided effort to ensure that the jury understood the criminal implications of the circumstantial evidence adduced by the People. This attempt to sway the jury to the prosecution's point of view, in what otherwise had the markings of a close jury trial, caused Santana undue and substantial prejudice. Accordingly, reversal is required.

In light of this disposition, the instructional issue raised by Santana, as well as the People's request for modification of the judgment, are moot. However, it is worth noting the willingness with which the trial court removed CALJIC No. 3.31, the standard instruction on the concurrence of act and specific intent, from the jury's consideration. Although CALJIC No. 3.31 must be given sua sponte in a specific intent crime (*People v. Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892]), and the evidence against Santana was gathered at two different times and places, the trial court concluded the instruction was unneeded in this case because no reasonable juror could conclude the drugs found at the Garvey Avenue apartment had not been possessed for the purpose of sale.[2] Notwithstanding the merits of this issue, the cavalier manner in which relevant standard jury

[2]After the jury had been instructed, the trial court indicated for the record it had not given CALJIC No. 2.02 (Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State) or CALJIC No. 3.31 (Concurrence of Act and Specific Intent), because these instructions merely emphasized the intent to sell element of the charged offenses. The trial court

instructions were deleted because they assertedly would only confuse the jury, reveals the extent to which the trial court had aligned itself with the prosecution in the trial of this case.

In sum, we conclude the trial court deviated so far from its duty to conduct Santana's jury trial in a fair and impartial manner as to require reversal of the conviction.

## DISPOSITION

The judgment is reversed.

Kitching, J., and Schneider, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied September 13, 2000.

.

---

found, based on the amount of methamphetamine and cocaine present in the apartment, "it's simply inconceivable that the jury would have any question that somebody possessed it for sale . . . . I mean it's just not possible at all that these huge amounts can be for personal use, so I thought it would be overemphasizing that point and distracting the jury and getting them to concentrate on a nonissue which could be prejudicial" to Santana. The trial court asked if defense counsel accepted the trial court's reasoning the instruction would "unduly emphasize something that's not in issue to the defendant's detriment." The trial court reiterated, "This case is all about possession. The question is who possessed it and whether the defendant was a principal in that possession. I don't think any reasonable person could possibly contend that somebody had it all for personal use. It's just ridiculous."

Defense counsel admitted he had agreed with the trial court at the sidebar but now wished to object. The trial court stated: "Well, if you felt that strongly about it, . . . I would have given the instructions that at the side bar you agreed as you just did a moment ago that it wasn't necessary . . . . [¶] . . . I think that I should not emphasize matters to the jury. They've already told what the specific intent was. And since there's . . . no possible issue on it, I think the record's in good shape in that regard."

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution. .