Filed 1/26/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br>v.<br><br>MALIK WILLIAMS,<br>　　　　Defendant and Appellant. | A157283<br><br>(Solano County<br>Super. Ct. No. VCR-227914) |

Defendant Malik Williams appeals from a judgment after a jury found him guilty of felony burglary of a home. The entire case against defendant was based upon latent fingerprints found at the crime scene and identified as a match to those of defendant. No witness identified defendant, there was no other evidence of defendant having been on the scene, defendant was not found to own a car consistent with the getaway car, and defendant was never found to be in possession or otherwise connected with items stolen from the home.

Defendant contends that the trial court committed prejudicial misconduct during the questioning of the prosecution's fingerprint expert witness by repeatedly interrupting the defense's cross-examination to cut off responses or ask its own questions and then, after redirect, asking a series of questions implying that the defense could have, but failed to, hire its own expert. For the reasons set forth below, we conclude that the trial court improperly aligned itself with the prosecutor in the minds of the jury by the

1

manner and content of his questioning of the fingerprint expert, and that the questioning constituted prejudicial misconduct that warrants reversal.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with one count of felony burglary under Penal Code section 459.[1] The information alleged that defendant had entered "an inhabited dwelling house and trailer coach and inhabited portion of a building occupied by M.T., with the intent to commit larceny and any felony."[2] Defendant was represented at trial by an assistant public defender.

M.T. testified at trial as follows. M.T. drove home from work on March 30, 2016 to find the back door of his house open and two men walking in the alley next to his house. He pursued the men in his vehicle but lost sight of them as they ran and got into a red Mustang. M.T. identified them as two black men, but "didn't really get a great look at them" and could only see their silhouettes as the sun was in his face. He called the police and then returned home to surveil the damage – jewelry, a cash box, and video game equipment had been stolen. M.T. had locked the back door when leaving his house, and concluded that the point of entry was his window as it had been pried open and the window lock was broken.

The police officer who responded to the scene testified as follows. He was able to lift fingerprints from the broken window and booked them into evidence. A fingerprint analyst then compared those latent fingerprints with defendant's fingerprints taken from an Automated Fingerprint Identification System (AFIS) report generated when defendant was arrested in 2014. The AFIS report was admitted into evidence. The officer testified that

---

[1] Unless otherwise indicated, all further section references will be to the Penal Code.

[2] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim by his initials only.

2

defendant's address as listed in the AFIS report was 0.3 miles from M.T.'s house. There was no evidence presented as to whether that was defendant's address on or about the time of the burglary.

Thereafter, the officer showed M.T. a photograph of defendant, but M.T. could not identify defendant as one of the two men he saw in the alley. Defendant's home was not searched for the stolen property, and none of the property was otherwise located in defendant's possession. Finally, defendant did not have a red Mustang registered in his name.

In sum, there was no evidence tying defendant to the burglary other than the fingerprint evidence.

## A.     Evidence Code Section 402 Hearing

One of the prosecution's proposed trial witnesses was Department of Justice (DOJ) latent print analyst Vivian Zhang, who was to testify regarding her comparison of the latent fingerprints recovered from the broken window to defendant's known fingerprints. Defendant moved to preclude or limit the proposed testimony on the grounds that fingerprint analysis does not pass muster under *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 and *People v. Kelly* (1976) 17 Cal.3d 24, and requested a hearing under Evidence Code section 402 (402 hearing).[3]

At the 402 hearing, and before Zhang testified, the trial judge expressed dissatisfaction regarding defense counsel's failure to retain an expert witness: "So, we are here on the morning of trial, you're asserting this, and you're not backing it up with the traditional means by which attorneys come in and present evidence on which the Court can make such

---

[3] Evidence Code section 402 provides that a court may hear and determine a question as to the admissibility of evidence out of the presence of the jury.

3

findings and that is expert testimony." The judge continued: "If she's going to offer bad science, that's why you bring in scientists to counter it. But apparently you're not doing that."

After Zhang testified regarding her analysis and her understanding of the error rates associated with fingerprint analysis, the trial judge denied defendant's motion to exclude or limit her testimony at trial. In so doing, the trial judge shared its views that the Public Defender's office was providing inadequate representation as a matter of course: "[T]his is just not how you should operate here. I am struggling with whether or not -- I have complained in this courtroom several times over the last month whether or not defendants are getting fair trials or not because of a lack on the part of your office to adequately resource cases. I'm struggling here now because it seems to me that everything that you are trying to do here, if you are, is one of two things. [¶] One, either you're inadequately resourced and didn't spend the money to hire your own expert [to] flesh these things out. Or secondly is just smoke and mirrors on day two of trial. At this point I'm not finding you're going anywhere near a basis for me to preclude this witness from testifying or to limit her testimony."

## B.    Trial Testimony of Fingerprint Expert Zhang

Zhang testified on direct examination that she received the latent fingerprints lifted from the broken window, scanned them into her computer system, and then conducted a search to compare the latent fingerprints to known fingerprints using the automatic latent print system (ALPS) database. She set the parameters of her search to yield 100 results, which returned results automatically ranked by strength of the comparison; defendant's known fingerprints were ranked as the first result. She then analyzed the latent fingerprints visually with a magnifying glass, compared them with

4

defendant's known fingerprints, and determined there were sufficient points of commonality to conclude they were a match. There were sixteen points of commonality, but only eight were needed to make a match under DOJ policy. Zhang also testified that she was not aware of defendant's address when she conducted her comparison of the fingerprints. She did not know the error rate associated with fingerprint analysis, but stated that she had never made an erroneous identification. She further stated that her conclusions were always verified by a second examiner.

On cross-examination, Zhang confirmed she only reviewed defendant's known fingerprints, and not any of the other 99 results from the database search. The trial judge interjected to ask whether the system keeps a record of those other 99 results, and Zhang replied it is kept electronically only for three days; she had not printed it out. When defense counsel asked if she had even opened the files of the other results, Zhang did not have the chance to answer before the trial judge responded: "She has said a couple different ways now she thought they got a positive finding on the first one and she stopped looking at the other images after that."

Zhang testified, in response to defense counsel's questions, that her written report did not document her visual comparison of the fingerprints, but rather only her final conclusion that the fingerprints contained sufficient points of commonality. When asked how a second evaluator could verify her conclusion if only the conclusion, and not her actual analysis, was in the report, the trial judge made a sua sponte objection: "That's argumentative and speculative. She didn't document it." When Zhang was questioned about not documenting the reasoning for her conclusions, the trial judge responded: "That was argumentative." After Zhang testified that the second evaluator does not see the commonality markers that she identifies to make a

5

fingerprint match, the trial judge asked Zhang: "So the person who verifies the fingerprint, do they look at the fingerprint?" When Zhang answered yes, the trial judge asked: "They do the same thing you do?" When Zhang answered yes again, the trial judge stated: "So both of you looking at the fingerprint, that is the primary basis for both of you to opine whether or not there's a match?" Zhang then testified, in response to questions from defense counsel, that the second evaluator sees her conclusion before verifying that conclusion; in other words, the second evaluation is not blind. The trial judge again interjected, this time to ask Zhang: "But everyone's looking at the fingerprint? You look at a fingerprint, you make an opinion?" Zhang answered yes.

Zhang was questioned by defense counsel regarding whether there were any studies regarding points of commonality between fingerprints. She was unaware of any study that determined how many sets of fingerprints have eight points in common, and was then asked if she knew whether any two people's fingerprints share eight points in common. The trial judge made a sua sponte objection: "That was asked and answered." That question, however, had not actually been asked and answered.

Zhang was questioned by defense counsel regarding several reports and studies on the error rate associated with fingerprint analysis. She was not familiar with some of the reports. Defense counsel attempted to refresh her recollection regarding a 2012 report by beginning his question with "This was comprised of a committee including . . ." at which point the trial judge interjected: "Not like that you don't. Do you want to ask her a specific question, don't just start describing a report." When asked about another 2012 report, the trial judge stated: "If you want to show her something and see if that refreshes her recollection, go ahead and do that." When defense

6

counsel began his question about a 2016 report by reading the title of the report and adding "that says several authorities . . ." the trial judge interjected: "Hold on. Ask that part of the question. Did you read the report?" The trial court then excused the jury for a recess, and told defense counsel that he was "repeatedly [] violating the Rules of Evidence in an effort to publish information to the jury that you otherwise may not have the ability to do so." The trial judge stated that it was "going to start being even brisker in stomping you when you do that" and warned that "[i]f you keep throwing certain pitches, I'm going to start calling them in a way that is not going to be to the benefit of you or your client." When the jury returned, defense counsel questioned Zhang regarding an FBI study. She testified that she was aware of its conclusion that the false positive rate for fingerprint identification was 1 in 306. She also testified regarding another study concluding that the error rate was 2.5%.

Zhang was also questioned by defense counsel regarding an error that she had made in the illustration she had prepared for trial of her fingerprint analysis, which identified an additional, and incorrect, point of commonality between the latent fingerprints and defendant's fingerprints. Defense counsel asked whether the verification by the second examiner could have contained a similar error. The trial judge made a sua sponte objection: "That's been asked and answered." It had not, however, been asked and answered. On redirect, Zhang explained that DOJ has safeguards in effect to prevent or guard against fingerprint identification errors. Specifically, her conclusions are verified by a second examiner, and then the case is sent to a supervisor for a "technical and administrative" review before being finalized. She also explained that her analysis involved only a visual comparison of the

7

fingerprints through a magnifying glass, and she did not make any physical marking of the points of comparison on the fingerprints.

After redirect was concluded, and with no questions having been submitted by the jury, the trial judge asked Zhang the following questions:

"THE COURT: Let me ask you, ma'am, is there anything about the process of testing fingerprints that degrades them?

"THE WITNESS: Can you rephrase?

"THE COURT: You took these two prints and you evaluated them.

"THE WITNESS: Yes, under a glass.

"THE COURT: Is there anything about that that destroyed or degraded the image?

"THE WITNESS: No.

"THE COURT: So, if I wanted to do the same thing, if I wanted to take these two fingerprints and compare them myself, if I wanted to hire someone to do it, they could – they can review the very same thing that you reviewed, correct?

"THE WITNESS: Yes."

On recross, Zhang testified that she did not hold any certification associated with her position as a latent print analyst.

C.    **Motion for Mistrial**

Defense counsel promptly moved for a mistrial based on the trial court's questions, arguing that "[t]he Court was implying as if the defense had an obligation, maybe it should have compared the prints of [defendant] with an expert of their own, and I think that is misleading to the jury and I think it's denying my client due process of law and implying as though there's something for the defense to prove, when there's not." In other words, the

trial judge told the jury "that an expert could have been hired to compare the prints and implied that it wasn't." The trial judge responded: "I didn't say by whom. I said it could have been." The only parties to the case were the prosecution and the defense.

The trial judge stated: "So you don't think [the prosecutor] could get up in his closing argument tomorrow and say something to the effect of, you know we didn't hear but there may be hundreds or thousands of fingerprint experts who could have looked at this and would come in and say there's something wrong about this identification and you didn't hear from one of them." It continued: "I think you ought to be prepared for that argument." The trial court denied the motion without prejudice, indicating to defense counsel that it would revisit the motion the next morning "if you can find a case that shows that it is prejudicial to inquire as to whether or not an item could have been retested." The next morning, defense counsel stated that he could not find a case where "the Court, on their own purview, interjected the idea that the defense could have called a witness and didn't call a witness and suggested to the prosecution that they make that argument." The trial judge responded: "I didn't suggest to them. I said what are you going to do if they make the argument."

Defense counsel argued that the trial court's initial question to the fingerprint expert was improper, as it is not a "scientific probability" that "putting a magnifying glass over the fingerprint" would "damage the integrity of the fingerprint in any way." The trial judge responded: "First of all, I did not know that because neither of you asked those questions very clearly. But anyway . . . I was a defense lawyer for 20-something years. A, you're free to come at me anyway that you like to, but I understand the practice of defense. I understand working the rev [*sic*] like you're working right now. I

9

understand all of these things.  As to this particular issue, the record was incredibly unclear about the state of that exhibit . . . ."

Defense counsel then argued that the trial court's follow up question to the fingerprint expert implied the defense had an obligation to call a fingerprint witness, knowing full well from the 402 hearing that the defense was not going to call such a witness, and thus appeared to be "taking issue with the trial tactics of counsel" and expressing bias by "impugning the defense preparation of the case," lumping it together with some other activity or conduct from the Public Defender's office.  The trial judge responded that there was "some truth" to that issue.

The trial judge stated:  "I made comments early about a lack of resources of your office.  That's what I said.  I said your office was not resourced.  Your former boss, Mr. Najara left about a month ago.  We could have a detailed discussion as to that, as to why the main Public Defender is now leaving now.  As to why multiple grand juries are investigating your office.  We could have a discussion about all of those things.  But it's a side show to what my comment was.  My comment was about resources that you had not resourced these things.  It didn't come up in the context of you executing a strategy to not hire a witness.  It came up in the context, when I specifically asked you what were you going to do when you tried to impeach this witness with articles and she told you that she didn't remember them, what were you going to do about that.  I specifically warned you in advance that there was a risk of that happening because you had not hired an expert to put that expert on the stand to have them explain to the jury the risks and nature associated with fingerprint things you decided to do it, not hire investigating resources on this thing ask taking a gamble that you were going

10

to be able to fully impeach the witness with your cross-examination of the those [*sic*] articles."

The trial judge continued: "As to my comments about the lack of resourcing of your office and your strategy to go forward, the record perfectly reflects, in advance, I warned you that there was a risk of it happening. It did happen exactly as I predicted and exactly as I warned you and that's what lead to things yesterday. [¶] Those comments had nothing to do with any efforts to undermine your choice of calling experts. That was an observation about the risks posed when you don't invest the resources or take the time to present these issues on your own." The motion for mistrial was denied.

### D.    Relevant Jury Instructions

The trial court instructed the jury, using CALCRIM No. 220, that the presumption of innocence "requires the People to prove a defendant guilty beyond a reasonable doubt." It instructed the jury, pursuant to CALCRIM No. 222, that "[o]nly the witnesses answers are evidence. The attorneys questions are significant only if they help you to understand the witness's answer and don't assume that something is true just because an attorney, or myself, asked a question that suggested it was true." The trial court also provided CALCRIM No. 3550: "Again, it has not been my role to tell you what your verdict should be. Don't take anything that I said or did during this trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

### E.    Closing Arguments

In his closing argument, the prosecutor stated he had to "make some comments at this time about [defense counsel's] cross of Ms. Zhang" and went on to say the defense "presented nothing and there is nothing doubting the

11

validity of Ms. Zhang's analysis in this case." Defense counsel argued that the "[o]ther thing I want to point out to you is that the defense has no obligation to prove anything at all. And you're going to read jury instruction 220. The judge read it to [*sic*] as well. It has to do with reasonable doubt." He later continued: "I don't want you to be swayed by the Court or the District Attorney if they say anything to you that seems to imply that [defendant] has something to prove in this case. He does not. The defense does not have to prove or disprove anything in this case."

After defense counsel's closing, the trial judge stated to the jury: "Let me point something out to you. I am going to give you an instruction, I'm going to tell you then what I'm going to tell you now, that is what I think about things does not matter. That's why you're here making the big bucks. You decide what the facts are in this case. You should not speculate about anything that I think about the facts or about this case." It continued: "Now, having said that, my questions are just like anyone else's questions. The only relevance is to the extent they help you understand the answers. Having said that, everything else I say you are governed by."

On rebuttal, the prosecutor focused on the lack of a defense expert witness: "defendant is under no obligation to establish their innocence in a criminal case. . . . While it's true that defendant does not have the burden, the prints are still in evidence. They're in evidence right now. Testimony of Ms. Zhang is that nothing during the testing process destroyed them . . . . Sitting there in evidence, ready to be examined by somebody else, if somebody wanted to. The defense, who is free to subpoena other experts to take the witness stand, look at those fingerprints say no Ms. Zhang was wrong, that would be direct evidence that Ms. Zhang, in this case, was wrong. They didn't do it. The reason they didn't do that is because that expert

doesn't exist and Ms. Zhang is correct that those are the defendant's prints on that house." The prosecutor continued: "I think you would have to be incredibly naive to believe that if there's an expert out there to come in here and testify that those, in fact, are not the defendant's prints, that Ms. Zhang is incorrect and that her verifier is incorrect and that it is a false positive . . . . Don't you think you would have heard from somebody to testify to that? You didn't. Instead [defense counsel] kept grasping at straws and claiming that other analysts in other jurisdictions have been wrong before so there this analyst is wrong here."

### F. Post-Trial Motions

Defendant filed a motion to disclose juror contact information in order to "investigate a new trial motion" based on the trial court's questioning of the fingerprint expert witness. It was denied. Defendant filed a request for evidentiary hearing pursuant to Evidence Code section 1150, to directly question jurors about a perceived obligation of the defense to present evidence or application of an improper burden of proof. It was denied. Defendant then filed a motion for new trial, arguing that the trial court erred when it questioned the fingerprint expert witness, and violated defendant's right to a fair trial, due process, and confrontation. It was likewise denied.

### G. Judgment

The trial court entered judgment, suspended imposition of sentence and placed defendant on five years of probation, conditioned on defendant serving one year in county jail, and authorized defendant to serve the balance of his sentence in an alternative sentencing program.

Defendant timely appealed.

13

**DISCUSSION**

Defendant argues his conviction must be reversed because, among other things, the trial court committed prejudicial error when it repeatedly interrupted the cross-examination of Zhang and then asked its own series of questions to Zhang about the degradation of the fingerprints, and the possibility that someone else could have been hired to review the fingerprints just as Zhang had done. He contends that the court's participation in this examination improperly bolstered the prosecution's case and "laid the foundation for the prosecution to make a failure to retest argument."

We review claims of judicial misconduct under the de novo standard and on the basis of the entire record. (*Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 391–392; *People v. Peoples* (2016) 62 Cal.4th 718, 789.) The initial step of our inquiry is to determine whether the trial court's examination of a witness constituted judicial misconduct. (*People v. Perkins* (2003) 109 Cal.App.4th 1562, 1567.) If we determine there was misconduct, we then assess whether the misconduct prejudiced defendant such that reversal is warranted. (*Id.*; *People v. Harris* (2005) 37 Cal.4th 310, 351.)

**A.    Judicial Misconduct**

In ascertaining whether or not the trial court's participation in the questioning of the fingerprint expert constituted judicial misconduct, we begin with the general legal principles governing a trial judge's role in the examination of witnesses.

Evidence Code section 775 provides that a trial court "may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party." This ability is consistent with "the right and the duty of a

14

judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence." (*People v. Corrigan* (1957) 48 Cal.2d 551, 559.)

While the trial court *can* question a witness, it is "ordinarily better practice for a trial judge to let counsel develop the case and to undertake the examination of witnesses only when it appears that relevant and material testimony will not be elicited by counsel." (*People v. Rigney* (1961) 55 Cal.2d 236, 243 (*Rigney*).) The danger posed by the trial court's questioning of a witness is readily apparent: "Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant. It is unnecessary to cite the cases bearing on this subject. It is a fundamental principle underlying our jurisprudence." (*People v. Mahoney* (1927) 201 Cal. 618, 626–627.) Accordingly, a trial court must avoid asking questions of a witness in a manner that "align[s] himself with the prosecutor in the minds of the jury." (*Rigney*, *supra*, 55 Cal.2d at pp. 241–242; *People v. Santana* (2000) 80 Cal.App.4th 1194, 1206–1207.)

Balancing the trial court's ability to question witnesses with the inherent danger of doing so, it is appropriate for a trial judge to participate in the examination of a witness " ' whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " (*People v. Carlucci* (1979) 23 Cal.3d 249, 256 (*Carlucci*).)

None of these circumstances is applicable to the trial judge's questions regarding quality of the fingerprints or ability to hire an expert. The questions did not aid in "preventing misunderstanding" or "clarifying the testimony," as there was no prior testimony that could have been misunderstood to suggest potential degradation of the fingerprints or lack of availability for re-testing – that was simply not a live issue in the case. (*Carlucci, supra*, 23 Cal.3d at p. 256.) Similarly, the questions did not aid in "eliciting the truth" or "covering omissions," as there was no testimony that brought into question the quality or availability of the fingerprint evidence. (*Ibid.*) Zhang testified that she scanned the latent fingerprints into a computer system, and then reviewed the fingerprints visually with a magnifying glass. She testified that she did not physically mark the fingerprints. Nothing in her testimony suggested that the latent fingerprints were no longer available or were degraded by that process. Finally, while the facts elicited from the trial judge's questions may have been potentially "material," they were not material in this case given that the quality of the fingerprint evidence was not in dispute. (*Ibid.*)

Not only did these questions fall outside the ambit of appropriate circumstances for examination by a trial court, but they also did not reflect an attempt by the court to "fairly" aid in eliciting testimony. (*Carlucci, supra*, 23 Cal.3d at p. 256; *Rigney, supra*, 55 Cal.2d at 244 [concluding that trial judge's questioning of witnesses was not improper where they "fairly and impartially" brought out relevant and material testimony].) Here, the record shows that the questions regarding the quality of the fingerprints and ability to hire an expert were improper on their face. The trial judge asked its initial questions regarding potential degradation of the fingerprints in an apparent effort to lay the foundation for its ultimate question, whether

16

"someone" could be hired to do the same review of the fingerprints that Zhang had done. The trial judge's reasoning that the question was proper because he "didn't say by whom" another expert could be hired is utterly unpersuasive: other than defendant, there was no other party who could have hired an expert. The only import of the trial judge's question was that defendant could have hired an expert, but did not do so.

By asking these questions, defendant argues on appeal that the trial court deviated from judicial impartiality and improperly assumed the role of the prosecution to develop evidence on its behalf. The Attorney General does not directly respond in its briefing on appeal, instead arguing that the court's questions were to "clarify" Zhang's testimony that she performed a visual comparison and did not physically mark the fingerprints. On the motion for mistrial, the trial court similarly reasoned that its questions were proper because the record was "incredibly unclear" about the state of the fingerprint exhibit. Such statements are entirely inaccurate. As described above, there was no dispute as to the quality or availability of the fingerprints and thus there was no need to "clarify" any testimony. Even if there had been some clarification needed as to potential degradation of the fingerprints, the trial court's final question regarding the hiring of another witness had *no* proper purpose. Instead, the question bolstered the testimony of Zhang and highlighted defendant's failure to hire an expert without having another, proper, purpose. In so doing, the trial judge improperly "align[ed] himself with the prosecutor in the minds of the jury." (*Rigney*, *supra*, 55 Cal.2d at pp. 241–242.)

The trial judge's participation in the cross-examination of Zhang likewise reflected this alignment. It interrupted the defense's cross-examination at least a dozen times with its own questions and sua sponte

17

objections – in so doing, it bolstered the credibility of Zhang by asking follow up questions that appeared to minimize potential reliability problems with Zhang's written report and the second examiner verification, and did not allow relevant and appropriate cross-examination on the scientific reports and studies regarding fingerprint identification errors by cutting off defense counsel, despite no objection by the prosecution, and not allowing Zhang to answer the questions. While any particular interruption or question, standing alone, may not constitute judicial misconduct (*People v. Woodruff* (2018) 5 Cal.5th 697, 772), they together "reveal[] the extent to which the trial court had aligned itself with the prosecution in the trial of this case" (*Santana, supra*, 80 Cal.App.4th at p. 1209).

The trial judge's comments at the 402 and motion for mistrial hearings confirm this conclusion. At the 402 hearing, the trial court repeatedly criticized defense counsel for failing to hire an expert and expressed its frustration with the Public Defender's office for, in its view, inadequately resourcing the defense of not only the instant case but numerous cases. At the motion for mistrial, the trial court stated that defense counsel "ought to be prepared" for a closing argument from the prosecution regarding the defense's failure to hire an expert to retest the fingerprints: "I warned you that there was a risk of it happening. It did happen exactly as I predicted and exactly as I warned you and that's what lead to things yesterday." But the reason that the testimony played out "exactly" as the trial court predicted was because the trial court *made* it so by usurping the role of the prosecutor and eliciting testimony that achieved its "predicted" result.

Rather than being simple error, the trial judge's involvement in the questioning of the expert witness and commentary at hearings bear all the hallmarks of improper judicial demeanor and appear to be born of the judge's

18

disapproval of the Public Defender's office. (See *Santana*, *supra*, 80 Cal.App.4th at p. 1207 [concluding that the trial court's questioning "appears to have been motivated by a desire to assist the prosecution's case"].) In fact, at the motion for mistrial defense counsel noted the trial court appeared to be "taking issue with the trial tactics of counsel" and expressing bias by "impugning the defense preparation of the case," lumping it together with some other activity or conduct from the Public Defender's Office. The trial judge responded that there was "some truth" to that and went on to again say how, in its view, the public defender's office was not properly resourcing cases and had numerous issues: "I made comments early about a lack of resources of your office. . . . Your former boss, Mr. Najara left about a month ago. We could have a detailed discussion as to that, as to why the main Public Defender is now leaving now. As to why multiple grand juries are investigating your office. We could have a discussion about all of those things." None of these matters, whether the departure of the Public Defender or "multiple grand juries" or the decision not to hire a defense expert, had any relevance to the question before the court, which was whether his questioning of the fingerprint expert was improper.

In sum, we conclude the trial judge's participation in the questioning of the fingerprint expert constituted judicial misconduct. Having reached that conclusion, we turn next to the question of whether the misconduct was prejudicial.

## B. Prejudice

When a trial court commits judicial misconduct, we apply the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 to determine whether the misconduct was prejudicial. (*Harris*, *supra*, 37 Cal.4th at p. 351.) Under this standard, we must ask whether it is "reasonably probable that the jury

19

would have reached a different guilt verdict had the court refrained from asking these questions." (*Id*. at pp. 350-351.) Any doubt as to whether or not prejudice has occurred is to be resolved in favor of the defendant. (*People v. Campbell* (1958) 162 Cal.App.2d 776, 787–788.)

We find *People v. Robinson* (1960) 179 Cal.App.2d 624 (*Robinson*) instructive. In *Robinson*, the appellate court determined that the trial court had committed prejudicial judicial misconduct by unnecessarily participating in the examination and cross-examination of witnesses, and taking upon itself to develop testimony helpful to the prosecution. (*Id*. at p. 633.) While the evidence was manifestly sufficient to justify the verdict, "it was not so strong or conclusive as to have precluded a reasonable doubt in the minds of the jurors as to defendant's guilt." (*Id*. at p. 636.) "The case was essentially one that required appraisal of the credibility of the witnesses." (*Ibid*.) Thus, *Robinson* concluded that the trial court's questioning of witnesses was prejudicial, as it affected the jury's appraisal and tipped the scales in favor of the prosecution. (*Id*. at p. 637.)

So too here. The fingerprint evidence was the primary evidence in this case connecting defendant to the burglary. The only other evidence was M.T.'s general description of the men he saw in the alley as two black men, and the geographical proximity of the address listed in the AFIS report to the location of M.T.'s house. The evidence may have been sufficient to support the jury's verdict, but it was not "so strong or conclusive" as to have precluded reasonable doubt as to defendant's guilt. (*Robinson*, *supra*, 179 Cal.App.2d at p. 636.)

Accordingly, this case turned on the jury's assessment of the accuracy and reliability of the fingerprint analysis conducted by Zhang. While our courts have repeatedly found that fingerprint evidence, alone, is sufficient to

support a burglary conviction (*People v. Bailes* (1982) 129 Cal.App.3d 265, 282), the question before us is whether the trial court's participation in the questioning of the fingerprint expert impacted the jurors' consideration of the evidence such that it is reasonably probable that the jury would have reached a different verdict had the trial court refrained from asking these questions (*Harris*, *supra*, 37 Cal.4th at p. 351). Here, Zhang testified that she did not review any of the other 99 results from the ALPS database and did not save the results. She testified that defendant's listed address from the AFIS report was available to her when she conducted her comparison, but that it was "not important" to her. She testified that there was no written record of her analysis, only her conclusion. She testified that she made an error in the illustration prepared for court, reflecting an additional point of commonality between the fingerprints that was incorrect. She testified that there is an error rate associated with fingerprint analysis, and that a study had concluded that error rate was 2.5%. The trial court skewed the jury's consideration of this evidence by interrupting the cross-examination and by asking questions to elicit testimony that buttressed Zhang's testimony and shifted the focus from potential reasonable doubt as to the accuracy or reliability of her conclusions to the import of defendant's failure to hire an expert. On this record, and resolving any ambiguity in defendant's favor, we conclude that the trial court's questions were prejudicial.

The trial court's instructions to the jury that it "not speculate about anything that I think about the facts or about this case" and that the court's questions were only relevant "to the extent they help you understand the answers" do not alter this conclusion. While we must assume that the jury followed its instructions (*Harris*, *supra*, 37 Cal.4th at p. 351), these instructions do not dispel the prejudice that was created by the trial court's

21

questions. (See *Santana*, supra, 80 Cal.App.4th at p. 1207 [concluding that repeated admonitions not to take any cue from the trial court's manner of questioning witnesses "could not dispel the inference, which appears on the face of the cold record, that the trial court found the People's case against Santana to be strong and Santana's evidence to be questionable, at best"].) The prejudice here does not stem from the jury speculating as to the court's views or by treating the court's questions as evidence. It stems from the substance of the testimony elicited by the trial court that carried the clear implication that defendant could have, but failed to, hire an expert.

In sum, we conclude that the trial court's participation in the questioning of the fingerprint expert witness constituted prejudicial judicial misconduct requiring reversal of the judgment.[4]

## DISPOSITION

Judgment is reversed.

---

[4] In light of our reversal, we need not and do not address defendant's other contentions that the trial court committed error through (1) extensive and unnecessary participation in the examination of witnesses; (2) disparaging and unequal treatment of defense counsel; (3) provision of strategic advice to the prosecution; (4) admission of fingerprint evidence; or (5) imposition of fines, fees, and assessments without prior determination of defendant's ability to pay.

22

 

_____

Petrou, J.

WE CONCUR:


_____

Siggins, P.J.


_____

Jackson, J.

*A157283/People v. Williams*

Trial Court:        Solano County Superior Court

Trial Judge:        Hon. Dan Healy

Counsel:        Office of Attorney General, Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney general, Jeffrey M. Laurence, Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, John H. Deist, Deputy Attorney General, for Plaintiff and Respondent.

First District Appellate Project, Jonathan Soglin, Lauren Dodge, and Deborah Rodriguez, for Defendant and Appellant.